**Earl K. MALLORY, Plaintiff,**

v.

**John F. HARKNESS, Jr.,
et al., Defendants.**

**No. 95–8319–CIV.**

United States District Court,
S.D. Florida.

July 7, 1995.

Steven Jay Wisotsky, Fort Lauderdale, FL, for plaintiff.

Barry Scott Richard, Tallahassee, FL, for defendants.

### FINAL ORDER GRANTING DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon plaintiff's request for a declaratory judgment that Florida Statute § 43.29(1)(a) is unconstitutional and a permanent injunction barring its enforcement. The Court finds that the race and gender-based quota as established by § 43.29(1)(a) violates the Fourteenth Amendment to the Federal Constitution and therefore GRANTS plaintiff the relief sought.

## I. BACKGROUND

Plaintiff applied for the sole vacancy on the Judicial Nominating Commission ("JNC") for Florida's Fourth District Court of Appeal. He received a letter stating that his application "cannot be considered" because he is not a woman or a minority as defined by the challenged statute. He then commenced this action, seeking emergency preliminary injunctive relief to prevent The Florida Bar Board of Governors from filling the vacancy as scheduled at its meeting on May 26, 1995.

On May 24, 1995, U.S. District Court Judge Daniel T. Hurley, serving as emergency duty judge, issued an Order to Show Cause why a temporary restraining order

should not issue and scheduled the matter for a hearing on May 25. At the hearing, counsel for The Florida Bar announced that the Bar would not defend the challenged statute. The Attorney General, having been duly served pursuant to Local Rule 24.1 B and having received notice of the Order to Show Cause Hearing, did not appear. Consequently, Judge Hurley granted plaintiff's Motion for a Temporary Restraining Order enjoining defendants from filling the sole vacancy on the JNC for the Fourth District Court.

Thereafter, this Court set the matter for hearing on Plaintiff's Motion for Preliminary Injunction, and the parties were heard on June 8, 1995. The Florida Attorney General filed a Motion to Intervene as well as a Response in Opposition to Plaintiff's Motion for Preliminary Injunction. Plaintiff filed a Reply. The Florida Bar, the Board of Governors, the Bar President and the Bar Executive Director filed an Answer disavowing any interest in defending the statute.

At the June 8 hearing, H.T. Smith, President of the National Bar Association, appeared and filed a Motion to Intervene on behalf of the Florida Chapter of the National Bar Association. The Court granted his Motion and permitted him to present argument. The Court also granted his request for ten days to submit a written response to the lawsuit.

The Court agrees with Judge Hurley that plaintiff has made the requisite showing for preliminary injunctive relief. The Court further finds that the material facts of the case are not in dispute: 1) that Mr. Mallory, a lawyer in good standing with The Florida Bar, timely applied for a vacant seat on the JNC for the Fourth District Court of Appeal; 2) that, aside from the challenged race and gender qualification, he met all of the statutory requirements for the position; and 3) that he was rejected by the Board of Governors solely on the basis of his race and sex.

Because the material facts of this case are not in dispute, this case is ripe for adjudication on the merits of the plaintiff's constitutional claims. Were this case at a later stage of the proceedings, entry of summary judgment under Rule 56 would be appropriate.

At this stage, however, hearing on the application for Preliminary Injunction should be, and hereby is, consolidated with final adjudication on the merits under Rule 65(a)(2). Counsel for plaintiff so moved *ore tenus,* and the other parties have not objected.

Accordingly, the Court makes the following findings of fact and conclusions of law with respect to plaintiff's claim that § 43.29(1)(a) violates the First and Fourteenth Amendments to the Federal Constitution.

## II. *FLORIDA STATUTE § 43.29*

Florida Statute § 43.29, which governs the composition of Judicial Nominating Commissions ("JNCs"), was amended on October 1, 1991, to provide that one third of all JNC seats be occupied by either a woman or a member of a racial or ethnic minority group. The amended section reads:

(1) Each Judicial Nominating Commission shall be composed of the following:

(a) Three members, at least one of whom **must be a member of a racial or ethnic minority group or a woman,** appointed by the Board of Governors of The Florida Bar from among The Florida Bar members who are actively engaged in the practice of law with offices within the territorial jurisdiction of the affected court, or in the district or circuit;

(b) Three members, at least one of whom **must be a member of a racial or ethnic minority group or a woman,** who reside in the territorial jurisdiction of the court or in the circuit appointed by the Governor; and

(c) Three members, at least one of whom **must be member of a racial or ethnic minority group or a woman,** who reside in the territorial jurisdiction of the court or in the circuit and who are not members of the bar of Florida, selected and appointed by a majority of the other six members of the commission.

(emphasis added). The JNCs, created by Article V § 20(c)(5)(a) of the Florida Constitution, are charged with receiving and reviewing applications for judicial vacancies and forwarding to the Governor at least three recommendations per vacancy from

which he selects and appoints a judge. There is a separate JNC for each judicial circuit, for each court of appeal, and for the supreme court. Fla. Const. Art. V § 11(d).

The amendment to § 43.29 imposes an outright ban on plaintiff's right to seek a particular state public office because of his race and gender. In future years, he is forever barred by statute, based on his race and gender, from applying for one-third of the seats for which lawyers are eligible. The statutory mandate that the particular seat here at issue and one-third of all JNC seats generally "must" be filled by a woman or a defined group member is therefore a quota.

## III. THE EQUAL PROTECTION CLAIM

Plaintiff first urges that the amended statute violates his individual rights under the Fourteenth Amendment because it imposes absolute race and gender-based qualifications for the particular JNC seat he seeks. The Court agrees. Applying strict scrutiny analysis, the Court finds that defendants have failed to assert a compelling state interest to justify an infringement of plaintiff's right to equal protection under the Fourteenth Amendment. Even if such justification existed, the Court nonetheless finds that the statute is not narrowly tailored to serve its ends.

■ Although the Equal Protection Clause generally allows the States considerable leeway to enact legislation that may appear to affect similarly situated people differently, *Clements v. Fashing*, 457 U.S. 957, 962, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982), the Supreme Court has consistently held that "[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Classifications based upon race must be justified by specific "judicial, legislative, or administrative findings" of past discrimination. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978). Accordingly, to meet the compelling

interest requirement, the State must present "particularized findings" of "prior discrimination by the governmental unit involved." *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 274, 276, 106 S.Ct. 1842, 1847, 1848, 90 L.Ed.2d 260 (1986).

### A. A Compelling State Interest Has Not Been Shown

■ In the present case, neither the Ethnic Bias Study Commission Report[1] ("Report") nor the intervening Attorney General has asserted, much less proved, that there has been any prior discrimination by JNCs in the screening of judge applicants. In conducting its inquiry, the Report did not positively identify any discriminatory policies or practices. Rather, the Report tentatively proposed three possible explanations for the lack of diversity in the Florida judiciary: 1) the small number of minorities in the legal profession, 2) the judicial election process, and 3) the judicial appointment process. Report at 15–17. With respect to judicial appointments, the Report could only find that "a strong correlation may exist between the lack of minority inclusion in the judicial selection process and the lack of minority judges." Report at 19. But later, the Report itself appears to have disposed of such sketchy intimations of bias in the nomination process: "Survey findings indicate that of whites, African–Americans, and Hispanics who apply for judgeships, comparable percentages of each racial pool are recommended to the Governor...." Report at 19.

It is of course conceivable that, in spite of inconclusive report findings, a court may nonetheless independently find that a pattern or practice of discrimination exists "where gross statistical disparities can be shown." *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). The Report itself discusses at some length the underrepresentation of minorities and presents statistics which, at first glance, might indicate a pattern of past discrimination: While African–Americans and Hispanics make up 13.8% and

---

1. Report and Recommendations of the Florida Supreme Court Racial and Ethnic Bias Study Commission, Reforming Practices Which Impede the Dispensation of Justice to Minorities in Florida (Dec. 11, 1990).

8.8% of Florida's general population, Report at 7 (based on the 1980 U.S. Census), they make up only 4% and 1.5% of all Florida judges. Report at 13.

Though these figures are by themselves interesting, they are not particularly relevant. The Supreme Court has made clear that "[w]hen special qualifications are necessary [to fill particular jobs], the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 726, 102 L.Ed.2d 854 (1989). It cannot be doubted that special skills are required to become a lawyer in good standing with The Florida Bar, as the JNC position at issue requires, and the relevant statistical pool should therefore be the number of minority Florida Bar members. The Report, however, offers only a comparison of judges against the Florida population in general. Its authors concede that "[n]either the [sic] Florida Bar nor any other agency currently maintains data on the number of minority attorneys in the state...." Report at 15.

In the absence either of any direct findings of racial bias in the nomination process or of any relevant statistical evidence of gross underrepresentation of minorities on the judiciary, the Court concludes that, even if defendants were to allege that past discrimination occurred in judicial nominations, no factual basis exists to support that finding.

In the absence of any proof of past discrimination in the judicial nominating process, the Attorney General attempts to defend the statutory quota by asserting that it furthers a "compelling state interest in a diverse judicial selection system based on merit." Intervenor's Resp. at 2.

The Supreme Court has repeatedly held that an interest in racial diversity alone is not sufficient to permit a race-conscious policy. Although the Supreme Court has recognized a compelling state interest in promoting racial diversity within the educational context, *Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61, such recognition has never been extended beyond the academic setting. *Hammon v. Barry,* 826 F.2d 73, 85 (D.C.Cir.

1987). Even within the educational context, the Supreme Court has specifically held that an asserted state interest in diversity is not properly advanced when diversity is measured exclusively by reference to race or ethnic origin. *Bakke,* 438 U.S. at 315, 98 S.Ct. at 2761.

Because the statutory quota attempts to promote diversity outside of the academic context and because it measures diversity strictly in terms of race and gender, the Court, though it readily acknowledges the good intentions of the legislature, finds that § 43.29(1)(a) does not properly advance a compelling state interest.

**B. *The Statute is Not Narrowly Tailored***

Even if the Court were to find that the statute advances a compelling interest, § 43.29(1)(a) would still violate the Equal Protection Clause because it is not narrowly tailored to achieve its intended goals.

■ To survive strict scrutiny, the remedy must offer the least intrusive method to accomplish its compelling governmental objective. *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1557 (11th Cir.1994). Rather than apply a categorical rule, the Supreme Court has looked to a number of factors, "including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of the third parties." *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987). Having considered § 43.29(1)(a) in light of these factors, the Court concludes that the statute is not narrowly tailored to serve its purpose.

**1. *An Absolute Quota is Not Necessary***

■ It is difficult to see how the statutory race and gender quota in question advances its intended goals with any degree of precision or certainty. The statute purports to pursue the goal of curing past underrepresentation of women and minorities on the

judiciary by offering any one of the reserved JNC seats to either women or minorities. The provision thus treats women and minorities as fungible groups. Thus, if far more women than minorities were to apply for a seat reserved for either group, a woman would most likely be appointed. It can hardly be argued that a statute which fails to consider the possible disparity between the percentages of women and minorities in the judiciary is narrowly tailored to accomplish its goals with respect to both groups. It simply cannot be "necessary" for the Board of Governors to appoint white women as a remedy for the underrepresentation alleged to have been suffered by racial and ethnic minority groups. Additionally, the absolute quota is unnecessary because it is only tenuously related to its goal. The quota has as its aim diversity in the bench. JNCs, however, do not appoint judges. The Governor appoints them from a list of three judicial candidates nominated by the JNCs. Thus, even assuming that women and minorities typically recommended applicants from their own respective gender, racial and ethnic groups—and the Court refuses to do this [2]— the Governor may appoint a JNC nominee for reasons utterly unrelated to his or her race or gender. One should reasonably expect a strong correlation between two categories of events before deeming a given measure "necessary." Here, however, where the nexus between an absolute quota on the number of women and minority JNC members and increased diversity in the judiciary rests on pure speculation and unfounded presumptions, the Court is inclined to doubt the necessity of the remedy.

### 2. *Less Intrusive Remedies Exist*

The Supreme Court has generally found laws which impose absolute bars on minority selection (i.e. quotas) are the least likely to survive strict scrutiny where other less drastic alternatives exist. *Paradise*, 480 U.S. at 184, 107 S.Ct. at 1073. In *Bakke*, for instance, the Supreme Court found that a

school admissions practice which called for an absolute quota on the number of minority applicants to be admitted each year was not narrowly tailored where the admissions office could have considered race as merely one of several relevant factors in the admissions process. *Bakke*, 438 U.S. at 316–17, 98 S.Ct. at 2761–62. In Florida, less drastic remedies already exist. Early in 1994, the state legislature amended Florida Statute § 26.021 to provide that

> [t]he judicial nominating commission of each circuit, in submitting nominations for any vacancy in a judgeship, and the Governor, in filling any vacancy for a judgeship, shall **consider** whether the existing judges within the circuit, together with potential nominees or appointees, reflect ... the racial and ethnic diversity of the population within the circuit, and the geographic distribution of the racial and ethnic minority population within the circuit.

1994 Fla.Sess.Law Serv. ch. 94–137, § 1 (emphasis added). Quite unlike § 43.29(1)(a), § 26.021 requires that the JNCs and the Governor "consider" diversity. The statute imposes no quota.

It should also be noted that the state has not attempted any race and gender-neutral alternatives to the above race-conscious programs. Because comparable percentages of minorities who apply for judgeships are recommended to the governor and are ultimately appointed as judges, *see* Report at 19, the problem appears to lie not with the JNCs but rather with the small percentage of minority applicants as compared to white applicants. Consequently, traditional non-quota outreach actions such as advertising in a publication with a large minority circulation might have and may increase minority applications for the judiciary.

### 3. *The Relationship Between the Numerical Goals of the Remedy and the Relevant Population is Weak*

■ In assessing whether a remedial program is narrowly tailored, a court should also

---

2. The very premise that "diversity will beget diversity," as the Attorney General insists, is improper. It is based on the stereotype that minority or female commissioners will favor their own. The Supreme Court has found that such assumptions "reinforce[] the perception that members of the same racial group—regardless of their age,

education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls," *Shaw v. Reno*, —— U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993), and has likewise rejected such perceptions as impermissible stereotypes. *Id.*

consider the strength of the relationship between the remedy's proposed numerical goals and the relevant demographic pool. *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066. This factor appears to be a variation on the question of whether the remedy is necessary to achieve its goals. The Court has already addressed this question at the beginning of this section and has found the relationship between the goals of the remedy and the relevant population tenuous at best. As earlier stated, defendants have provided no statistics with respect to the percentage of women and minority members of The Florida Bar, the relevant population in this case. Even if the Report's general population figures (blacks and Hispanics make up 13.8% and 8.8% of the general population, respectively) were usable, the statutory quota mandates that at least 33.3% of all JNC seats be filled by women and minorities. The Court finds this number excessive even with respect to the general population.

### 4. *The Remedy is Inflexible*

The preference mandated in § 43.29(1)(a) is absolute. It mandates that at least one member of each JNC must be a racial or ethnic minority or a woman. It also provides no waiver provision. As one federal court noted, "the Supreme Court has been highly critical of [such] rigid quotas." *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1573 (S.D.Ga.1994) (finding that a quota of 30 black judges was unconstitutional).

### 5. *The Remedy Imposes Significant Burdens on the Rights of Third Parties*

■ Under certain circumstances, the government may constitutionally require non-minorities "to share the burden of remedying past discrimination." *Peightal,* 940 F.2d at 1410. To the best of this Court's knowledge, however, no federal court has deemed the burden imposed by a rigid quota reasonable or insignificant where the asserted goal of the program was no more than racial and gender diversity for its own sake. The statutory quota in question forever bans plaintiff from applying for one-third of all JNCs. Although plaintiff and other white men in his position are not likely to suffer severe economic hardship from a 33% decrease in their opportunity to apply for a JNC seat, the Court nevertheless deems that the burdens imposed by the mandate on third parties—especially in light of the absence of a compelling state interest—is significant.

### 6. *The Remedy is Indefinite in Duration*

The duration of a race-conscious program is highly relevant in determining whether the remedy is narrowly tailored. Limited duration ensures that a remedial plan does not last longer than is necessary to achieve the targeted goal. *Peightal,* 940 F.2d at 1408.

The duration of § 43.29(1)(a) is indefinite. It provides for no termination date much less a target percentage of women and minorities in the judiciary. The Court therefore finds the statutory mandate excessive in length.

## IV. *THE FIRST AMENDMENT CLAIM*

In addition to the Equal Protection claim, plaintiff also contends that § 43.19(1)(a) violates his First Amendment rights. While Supreme Court precedent amply supports plaintiff's contention that his right to equal treatment under the Fourteenth Amendment has been violated, this Court has been unable to uncover any authority at any level that would sustain his expansive reading of the First Amendment's scope of protection.

Plaintiff urges that the First Amendment recognizes a fundamental right of qualified citizens to hold appointive office. His reliance on *Zeilenga v. Nelson,* 4 Cal.3d 716, 94 Cal.Rptr. 602, 484 P.2d 578 (1971), is troublesome. In that case, the California Supreme Court announced that "the right to hold public office, either by election or appointment, is one of the valuable rights of citizenship [citing a California case]. *Id.* 94 Cal.Rptr. at 604, 484 P.2d at 580. It is a fundamental right which the First Amendment protects against infringement [citing a Minnesota case]." *Id.* Though the quoted language is clear enough, it is based on phrases taken from court conclusions pulled out of context. In researching the Minnesota decision, this Court could find no mention of appointive office or even public office. That case dealt exclusively with elective office. Further, it is

unclear whether the *Zeilenga* decision itself was actually based on First Amendment analysis. The court in that case prefaced its analysis as follows: "This brings us then to the question of whether ... the Butte County Charter is unreasonably discriminatory and violates the Fourteenth Amendment of the United States Constitution as a denial of Equal Protection." *Id.* Finally, the provisions under review in *Zeilenga* imposed restrictions on access to an **elective** office. Consequently, the Court finds that California's amorphous constitutional analysis shall have no persuasive effect in the present case.

### A. Scope of the First Amendment Right to Hold Public Office

In order to determine whether plaintiff's First Amendment rights have been violated, it is useful to define with greater precision than plaintiff has offered the First Amendment protections accorded candidates for public office.

"Far from recognizing candidacy as a 'fundamental right,'" the Supreme Court has held "that the existence of barriers to a candidate's access to the ballot **does not itself** compel close scrutiny." *Clements*, 457 U.S. at 963, 102 S.Ct. at 2843 (emphasis added). "Constitutional limitations arise only if the classification scheme is invidious or if the challenged provision **significantly impairs** interests protected by the First Amendment." *Id.* at 971, 102 S.Ct. at 2848 (emphasis added). Within the context of candidacy for public office, the Supreme Court has understood **significant** infringements of a candidate's First Amendment rights as referring to provisions which coerce or prescribe a particular political view or membership with a particular association as a condition for candidacy or criteria for retention (where public officers are at risk of being laid off). *Elrod v. Burns*, 427 U.S. 347, 357, 96 S.Ct. 2673, 2681–82. In finding that a provision that required public employees to pledge allegiance to the Democratic Party in exchange for continued job security violated the First Amendment, the Supreme Court in *Elrod* held that the "First Amendment protects **political** association as well as **political** expression" and that political patronage, "to the extent it compels or restrains belief and association is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.'" *Id.* at 357, 96 S.Ct. at 2682. Applying the above principles, the Fifth Circuit in 1977 held that a Louisiana rule requiring judges to resign their position before announcing their candidacy for non-judicial office did not violate the First Amendment where it "did not burden [plaintiff judge's] right to vote for the candidate of his choice or to make statements regarding his private opinions on public issues outside a campaign context" or where it did not "penalize his belief in any particular area." *Morial v. Judiciary Comm'n. of State of La.*, 565 F.2d 295, 301 (5th Cir.1977).

### B. The Statutory Mandate Does Not Infringe on any of Plaintiff's First Amendment Rights

Viewed in light of the above authority, the Court cannot agree with plaintiff that his First Amendment rights have been violated. Simply put, it is hard to imagine how an absolute racial quota might induce plaintiff into altering his political beliefs or private associations in any way. Plaintiff could decide to become the staunchest advocate of affirmative action tomorrow. He might then apply for the same JNC seat next year, but to no avail—his application would be rejected just the same. Because the quota does not work any recognizable political coercion on non-female or non-minority JNC applicants, the Court finds that plaintiff's First Amendment rights have not been compromised.

## V. STATUTORY INTENT

Intervenor, Florida Chapter of the National Bar Association, filed a memorandum of law addressing solely the issue of statutory intent. Intervenor contends that § 43.29(1)(a) actually does not establish a quota because the language of the relevant provisions should be liberally interpreted as being merely advisory rather than mandatory.

The Court finds this argument entirely unpersuasive. The word "shall" in § 43.29(1)(a) refers explicitly to the number

**1564**

of seats (three) on the JNC. The word "must" explicitly relates to the requirement that one of the three seats on the JNC must be filled by a woman or a member of a racial or ethnic minority group. "Must" does not allow for any choice. It means "compulsion, obligation, requirement...." Webster's New World Dictionary, p. 969 (College Edition, 1964). Further, because the meaning of "must" is crystal clear, it would be improper for this Court to engage in the process of construction or interpretation. "When a statute is clear and unambiguous, the plain meaning of the statute must be given effect." *Polakoff Bail Bonds v. Orange County,* 634 So.2d 1083, 1084 (Fla.1994).

The language of the statute could hardly be clearer. The Florida Board of Governors understood the quota to be mandatory. So does this Court.

### VI. *CONCLUSION*

The Court finds that the race and gender-based quota imposed by § 43.29(1)(a) violates plaintiff's Fourteenth Amendment right to Equal Protection. Therefore, it is hereby

ADJUDGED that § 43.29(1)(a) is unconstitutional under 28 U.S.C. § 2201 and ORDERED that a permanent injunction barring its enforcement as to plaintiff, Earl K. Mallory, be entered as of the date of this Order.

**The Clerk of the Court shall CLOSE the case and DENY all pending motions as MOOT.**

DONE AND ORDERED.