Michael W. BACK

v.

Pamela CARTER, Attorney General, State of Indiana; Rudolph Clay, Ernest Niemeyer, Peter Katic, Commissioners of Lake County; Robert Antich, Clerk, Lake Circuit Court; Anna N. Anton; Evan Bayh, Governor, State of Indiana,

Randall T. Shepard, in his official capacity as a member of the Judicial Nominating Commission for the Superior Court of Lake County, Intervenor Defendant,

Richard J. Conroy, James Danikolas, Gerald N. Svetanoff, James J. Richards, Jeffrey J. Dywan, Richard W. Maroc, James E. Letsinger, William E. Davis, Mary Beth Bonaventura, Chief Judge, all in their official capacities as Judges of the Superior Court of Lake County, Intervenor Defendants.

No. 2:95–CV–288–RL.

United States District Court,
N.D. Indiana,
Hammond Division.

May 30, 1996.

David C. Jensen, Eichhorn Eichhorn & Link, Hammond, IN, for plaintiff.

Office of Indiana Attorney General, Indianapolis, IN; J. Justin Murphy, Sr., Bamber Bosch and Banasiak, Hammond, IN; Edward H. Feldman, Highland, IN; J. Michael Katz, Katz Brenman and Angel, Merrillville, IN; Ronald E. Elberger, George T. Patton, Jr., Bose McKinney & Evans, Indianapolis, IN, for defendants.

## ORDER

LOZANO, District Judge.

This matter is before the Court on the Verified Motion for Preliminary Injunction filed by Plaintiff on November 9, 1995; Intervening Defendants' Motion to Consolidate filed on January 18, 1996; Defendant Bayh's Motion to Dismiss or for Summary Judgment

filed on February 2, 1996; Motion to Dismiss filed by Defendants Rudolph Clay, Ernest Niemeyer, and Peter Katic, on February 26, 1996; Intervening Defendants' Motion for Summary Judgment filed on February 26, 1996; Defendants' Motion for Summary Judgment filed by Defendants Rudolph Clay, Ernest Niemeyer, and Peter Katic, on February 26, 1996; and Defendant Anton's Motion for Summary Judgment filed on February 26, 1996. For the reasons set forth below, the Motion for Preliminary Injunction is **DENIED IN PART** and **GRANTED IN PART**; the Motion to Consolidate is **DENIED**; Bayh's Motion to Dismiss or for Summary Judgment is **GRANTED**; the Motion to Dismiss by Defendants Clay, Niemeyer, and Katic is **GRANTED**; the Motion for Summary Judgment by Clay, Niemeyer, and Katic is **DENIED AS MOOT**; and the other Motions for Summary Judgment are **DENIED IN PART** and **GRANTED IN PART.**

### *FINDINGS OF FACT*

On January 25, 1996, the Court held a hearing on the Motion for Preliminary Injunction. These are the findings of the Court:

1. Plaintiff Michael W. Back, a white male, is an attorney licensed to practice law in Indiana. He practices law in Lake County and is a member of the Lake County Bar Association. In September 1993 he was elected by the attorneys who reside in Lake County to participate as an attorney member in the Lake County Judicial Nominating Commission ("JNC" or "the Commission"). He served as secretary of the JNC during his tenure from September 1993 to September 1995. When elected, Back had expected to serve a 4–year term until September 1997.

2. Defendant, Evan Bayh, is the governor of Indiana. Defendants, Rudolph Clay, Ernest Niemeyer, and Peter Katic, are the Commissioners of Lake County.

3. Defendant, Anna N. Anton, is the Clerk of the Lake Circuit Court. The Clerk of the Lake Circuit Court coordinates the election of JNC attorney members.

4. Intervening Defendant, Randall T. Shepard, Chief Justice of the Supreme Court of Indiana, intervened in his capacity as a member of the JNC. Intervening Defendants, Richard J. Conroy, James Danikolas, Gerald Svetanoff, James J. Richards, Jeffrey J. Dywan, Richard W. Maroc, James E. Letsinger, James L. Clement, William E. Davis, and Mary Beth Bonaventura, are judges of the Superior Court of Lake County.

5. The Lake County JNC was established in 1973 pursuant to Indiana Code section 33–5–29.5–1 *et seq.* Whenever there is a judicial vacancy in Lake County Superior Court, the JNC submits a list of three nominees to the Governor, who then appoints one of the nominees to the judicial position. After appointment, the judge serves for two years. To serve beyond this initial term, the judge must run in a countywide retention election.

6. From 1973 until July 1995 the JNC consisted of seven members headed by the Chief Justice of the Indiana Supreme Court. The other six members consisted of three attorneys and three nonattorney members, all residents of Lake County. The attorney members were elected by fellow Lake County attorneys. The nonattorney members were appointed by the Governor. According to the law, the appointment of nonattorney members was to reflect the composition of the community. Attorneys could not serve as nonattorney members.

7. In July 1995, an amendment to the law imposed several changes in the operation of the JNC. Those changes include the imposition of race and gender quotas for JNC membership. The amendment requires that at least one of the attorney members and one of the nonattorney members be a minority. It also mandates that two of the attorney members be women, and the two others be men. The same gender restrictions apply to the nonattorney members.

8. The amendment also included other changes in addition to the race and gender quotas. The JNC now consists of nine members, including four attorney and four nonattorney members. The Lake County Commissioners, instead of the Governor, now appoint the nonattorney members. The amendment clarifies that salaried public officials can participate as attorney members of the JNC. The amendment now requires

that the JNC consider the effect of racial and gender diversity on the quality of the judiciary when choosing nominees. Also, the amendment changed the manner in which attorney members were elected. Before the amendment, the Lake County attorneys could vote for only one candidate. Now the attorneys can vote for up to four different candidates. In effect, voters can cast up to four votes, but only for different candidates. The four candidates receiving the most votes become members of the JNC if they satisfy the race and gender quotas.

9. To implement these changes, the amendment ordered a new election of attorney members to be held on September 1995. New nonattorney members were appointed also in September 1995.

10. In June 1995, Back received a notification that his term as a member of the JNC would terminate prematurely so that a new election could take place under the new law. This new election forced Back out of the JNC in September 1995, rather than in 1997 as originally expected.

11. The election for the attorney members of the JNC under the new law took place in September 1995. Back ran for one of the positions, but he was not among the candidates receiving the most votes. He placed sixth in the number of votes received.

12. The Lake County Bar Association promoted the enactment of the amendment by the Indiana legislature. The Bar Association supported the amendment to the law as a response to a movement in the Indiana General Assembly which threatened to return to direct elections of judges in Lake County. The main concern of the Bar Association in supporting this legislation was to maintain the current judicial nominating system.

13. The Bar Association believed that a system of judicial nomination, as compared to judicial elections, results in a larger pool of qualified individuals interested in becoming judges and in a more independent judiciary. The Bar Association expressed two concerns with the system as operating before the amendment: (1) that the nonattorney members were named by the governor, giving him greater control in the nominating process, and (2) that the attorney members in the JNC did not reflect the racial and gender diversity of the population in Lake County.

14. The provisions in the amendment which removed from the Governor the power to appoint the nonattorney members and which increased the number of the JNC members were as important as to the Bar Association as the race and gender distribution requirements included in the amendment.

15. Prior to the amendment, women and minorities had been members of the JNC but never as attorney members. Although African–American, Hispanic, and women attorney candidates had run for the JNC positions, none were ever elected.

16. In the 1973 election, the first election held for JNC attorney members, two of the fifteen lawyer candidates were minorities (15%). In 1977, one of five candidates was a minority (20%). In 1981, two of ten candidates were minorities (20%). No female candidate ran for a JNC position before 1985. In 1985, of nine candidates one was a minority male, and one was a minority female (22% minority; 11% women). In 1989, of seven candidates one was a minority male, and one was a minority female (29% minority; 14% women). In 1993, three of seven candidates were minorities (43% minority). Of those three, two were women (29% women).

17. Between 1992 and 1995 about 10% of the lawyers in Lake County were minorities and about 20% were women. Before 1965, 1% of the Lake County attorneys were women and 4% were minorities. The 1990 census showed that women constituted 52% of the Lake County population and minorities 30%.

18. No evidence was introduced at the hearing that any intentional discrimination prevented women or minority attorneys from securing the signatures to participate in the election or from running in the election. No evidence was presented of intentional discrimination in the selection of nonattorney candidates.

19. No evidence was presented in the hearing that the JNC has acted discriminatorily in selecting judicial nominees to submit

**748**

to the governor. In fact, nominees have included minorities and women.

20. Back filed this suit challenging the provisions of the law requiring that one attorney and one nonattorney member be minorities and requiring that two attorney and two nonattorney members be female. The complaint does not challenge the other changes in the law. Back asks the Court for declaratory and injunctive relief.

### CONCLUSIONS OF LAW

■ 1. The Court cannot consolidate this action with *Hatcher v. Anton,* No. 2:95–CV–271, which is proceeding in front of a magistrate judge in this district.

Intervening Defendants request that the Court consolidate this action with another case in this district, *Hatcher v. Anton,* No. 2:95–CV–271, with *Hatcher* as the leading case. Defendants argue that these two cases involve a common question of law, *see* Fed. R.Civ.P. 42(a), because both *Hatcher* and this case challenge the gender and the racial requirements in the JNC membership.

■ The decision to consolidate is committed to the discretion of the court. *Fleishman v. Prudential–Bache Securities, Inc.,* 103 F.R.D. 623, 624 (E.D.Wis.1984); *see also Young v. City of Augusta,* 59 F.3d 1160, 1169 (11th Cir.1995) (affirming the denial of motion to consolidate even though the appellate court found that consolidation would have been appropriate, because Rule 42(a) does not mandate consolidation and no refusal to consolidate had ever been overturned). Courts can order the consolidation of cases that share the same questions of law or fact and where consolidation would not result in prejudice to any party. *Fleishman,* 103 F.R.D. at 624. The court should not order cases consolidated if consolidation would prejudice the interests of any party. *Vallero v. Burlington Northern R.R. Co.,* 749 F.Supp. 908, 913 (C.D.Ill.1990).

■ The parties in *Hatcher* have consented to present their case in front of a magistrate judge, pursuant to Title 28 U.S.C. 636(c) and Local Rule 72.1. All parties in a civil case must consent before a magistrate can try the case. *New York Chinese TV Programs v. U.E. Enterprises,* 996 F.2d 21, 23 (2d Cir.1993); *Morse v. Marsh,* 656 F.Supp. 939, 943 (N.D.Ill.1987); *see also Guess v. Chenault,* 108 F.R.D. 446 (N.D.Ind. 1985). The parties in this case have not consented to have this case tried before a magistrate. Therefore, this Court cannot order this case consolidated with *Hatcher.* To do so would force the parties in this case to proceed in front of the magistrate against their will. Accordingly, the motion to consolidate is **DENIED.**

■ 2. Back has standing to challenge the race and gender requirements for attorney members of the JNC.

■ A plaintiff must satisfy a minimum of three constitutionally required elements of standing. *U.S. v. Hays,* —— U.S. ——, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). First the plaintiff must have suffered an "injury-in-fact." An "injury-in-fact" constitutes the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Hays,* —— U.S. at ——, 115 S.Ct. at 2435; *see also Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136. Second, the plaintiff must show that there is a causal connection between the injury and the challenged conduct. *Hays,* —— U.S. at ——, 115 S.Ct. at 2435; *Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136. This has been described as the requirement that the injury be fairly traceable to the challenged action of the defendant. *Hays,* —— U.S. at ——, 115 S.Ct. at 2435; *Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136. Last, the injury must be the kind of injury that can be redressed by a favorable judicial decision. *Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136.

■ Since Back invokes federal jurisdiction in this case, he has the burden of establishing the elements of standing. *Hays,* —— U.S. at ——, 115 S.Ct. at 2435; *Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136. For the purpose of a motion to dismiss for lack of standing, the court will accept as true all the material allegations in

the complaint and construe the complaint in favor of plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). Under a motion for summary judgment, the plaintiff needs to set forth facts through evidence which supports his contention of standing. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137.

Back alleges that he was injured in violation of the Equal Protection Clause when the amendment terminated his term as a JNC attorney member prematurely to implement a discriminatory system for selecting JNC members. His equal protection injury resulted from the implementation of the amendment as applied to attorney members and will be redressed if the Court agrees with him and enjoins the enforcement of the discriminatory criteria.

■ Defendants, however, argue that Back does not have standing to challenge the amendment because he has not been denied a position in the JNC discriminatorily. Defendants showed at the hearing that Back ran for a JNC position in the elections held in September 1995, the first elections held under the amendment. Back was not among the four candidates who received the most votes. Therefore, Defendants argue, he lost his position because he did not receive enough votes not because of the application of the racial and gender criteria against him.

Defendants' argument fails because Plaintiff does not claim that he suffered an injury during those elections. Plaintiff's alleged injury is the premature termination of this term. His ranking in the September 1995 election is irrelevant.

■ Defendants also claim that Back has not been injured because Back does not have a right to finish his term in the Commission. As Defendants point out, the Indiana legislature has the power to change or abridge the term of a governmental position created by statute even during an incumbent's term. *Corn v. City of Oakland City,* 415 N.E.2d 129, 132 (Ind.Ct.App.1981). However, although a legislature has the power to change the organization and composition of nonconstitutional political positions, the legislature cannot do this for the purpose of subsequently violating the Fourteenth Amendment. As the Supreme Court explained in *Elrod v. Burns,* 427 U.S. 347, 360–61, 96 S.Ct. 2673, 2683–84, 49 L.Ed.2d 547 (1976) (citations omitted), even though a person does not have the right to a government benefit such as public employment, or as in this case, public office, and even though the government may deny him that benefit for any number of reasons, there are some reasons on which the government cannot rely: "The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." *Id.* Although *Elrod* involved a case of political firing, the holding of the Supreme Court can be applied here. Just because the legislature could terminate Back's tenure in the JNC at will, this does not allow it to terminate in order to achieve an unconstitutional goal, in this case the implementation of allegedly unconstitutional criteria for the JNC. Accordingly, the Court finds that Back has standing to challenge those criteria as they affect attorney members.

Back does not claim standing as an attorney who ran in the election held under the new law and he does not claim standing as an attorney who participated as a voter in the election under the new law. It is the burden of Plaintiff to show standing. Since Back does not argue standing on these bases, the Court will not consider whether he would have standing to challenge the amendment as an attorney running for a position or as an attorney voter. The Court only finds that he has standing as a result of his losing his prior JNC position.

■ 3. Back does not have standing to challenge the provisions affecting nonattorney member selection.

In his complaint, Back challenges the statutory provisions requiring minority and female representation in the JNC both for attorney and nonattorney members. Defendants argue that Back does not have standing to challenge the classifications that apply to nonattorney members. Defendants, Clay, Niemeyer, and Katic, whose role under the JNC law is solely to appoint the nonattorney

members, filed a motion to dismiss based on this argument.

A discrimination injury accords a basis for standing only to those who are personally denied equal protection by the challenged conduct. *Hays,* —— U.S. at ——, 115 S.Ct. at 2435; *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984). As a prudential consideration the Supreme Court generally has held that a plaintiff must assert his or her own legal rights and cannot rest a claim for relief on the legal rights or interests of third parties. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. The Supreme Court has cautioned against deciding the rights of third parties not before the court. *Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976).

Under certain circumstances the courts have allowed litigants to raise the concerns of third parties. In those cases, the courts have required the following: (1) the litigant must have suffered a concrete re-dressable injury from the conduct or statute challenged; (2) the litigant has a close rela-tionship with the third party whose rights the litigant is asserting; and (3) the third party is hindered in its ability to assert its own rights. *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 629, 111 S.Ct. 2077, 2087–88, 113 L.Ed.2d 411 (1991) (finding that a civil litigant had standing to raise a chal-lenge against race-based jury exclusions); *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 1370–71, 114 L.Ed.2d 660 (1991) (find-ing that a criminal defendant had standing to challenge race-based exclusion of jurors); *Caplin & Drysdale v. U.S.,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1981) (finding that an attorney had standing to challenge a drug forfeiture law as it affected his client's ability to pay for coun-sel).

Although Back cites several cases where the courts have allowed plaintiffs to raise the rights of third parties, those cases all re-quired that the claimant be injured by the challenged law. In the case at hand, Back has not been injured by the implementation of the classifications imposed on nonattorney

members. As an attorney, Back cannot par-ticipate as a nonattorney member in the JNC. None of the requirements for nonat-torneys apply to him. Also, the appointment of the new nonattorney members to the JNC under the new law proceeded separately from the election of the new attorney mem-bers and the termination of the tenure of prior attorney members. *Compare* Ind.Code § 33–5–29.5–30 (requiring appointment of nonattorney commissioners by September 1995) *with* § 33–5–29.5–31 (requiring elec-tions of attorney commissioners by Septem-ber 1995). Accordingly, the provisions of the law that have injured Plaintiff so as to give him standing are separate from those affect-ing nonattorneys. *See, e.g., Contractors Ass'n v. City of Philadelphia,* 6 F.3d 990, 996–98 (3d Cir.1993) (holding that the plain-tiff could challenge an affirmative action pro-gram as it affected construction contracts only, but not other types of contracts). Be-cause the Court does not find that the amendment as applied to nonattorney mem-bers injured Back, he does not have standing to raise their claims.

Before permitting an injured liti-gant to assert the rights of a third party, courts also have required that the litigant have a close relationship with the third party and that the third party be hindered in its ability to assert its own claim. *Edmonson,* 500 U.S. at 629, 111 S.Ct. at 2087–88. In this case, not only has Back not shown an injury from the provisions affecting nonattorney members, neither has he met the other re-quirements discussed by the Supreme Court. In the cases where the courts have allowed litigants to raise the rights of others, the enjoyment of those rights by the third par-ties was inextricably bound with the activities of the litigant. *Singleton,* 428 U.S. at 110, 96 S.Ct. at 2872. This is typical of the relation-ship between client and attorney, patient and doctor, and even vendor and client. *See Caplin & Drysdale,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (client-attorney); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (vendor-client); *Single-ton,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d

826 (doctor-patient).[1] Plaintiff has not shown that he is in a special relationship with the nonattorney members of the Commission. Neither has Back shown that his role as a JNC attorney member would be affected if he had to work with nonattorney members selected under the amendment. None of the cases cited by Plaintiff have found that a close relationship existed between people serving in an office together or between co-workers. While both attorney and nonattorney members serve together, their participation in the JNC is not inextricably bound.

█ Neither has Plaintiff shown that nonattorneys interested in serving on the JNC are particularly hindered in bringing their claim. *See, e.g., Clay v. Ft. Wayne Community Schools,* 76 F.3d 873, 878 n. 5 (7th Cir.1996). Nothing prevents an interested or an injured nonattorney from bringing a suit on his or her behalf. Indeed, in *Hatcher v. Anton,* No. 2:95–CV–271, a case filed in this district, a nonattorney also challenges the new JNC law.

Because the Court finds that Back does not have standing to challenge the provisions concerning nonattorney members and because the involvement of Lake County Commissioners Clay, Niemeyer and Katic is limited to the appointment of nonattorney members to the JNC, their motion to dismiss is hereby **GRANTED.**

█ 4. The Eleventh Amendment does not bar this action against the Governor of Indiana.

Defendant Bayh argues that the Court should dismiss the action against him because he is immune under the Eleventh Amendment. The Eleventh Amendment deprives federal courts of jurisdiction to consider suits against nonconsenting states. *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Ruehman v. Sheahan,* 34

F.3d 525, 527 (7th Cir.1994); *Smith v. Wisconsin Dept. of Agriculture,* 23 F.3d 1134, 1140 (7th Cir.1994); *Sherman v. Community Consolidated School Dist. 21 S,* 980 F.2d 437, 440 (7th Cir.1992), *cert. denied,* 508 U.S. 950, 113 S.Ct. 2439, 124 L.Ed.2d 658 (1993). Suits against state officials that are in fact suits against the state are also barred by the Eleventh Amendment. *Pennhurst State School,* 465 U.S. at 101–02, 104 S.Ct. at 908–09; *Sherman,* 980 F.2d at 440.

█ An exception to the Eleventh Amendment, first discussed by the Supreme Court in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), allows suits for injunctive relief that challenge the constitutionality of a state official's actions. *Pennhurst State School,* 465 U.S. at 102, 104 S.Ct. at 909. The exception is based on the idea "that an unconstitutional state enactment is void and that any action by a state official purportedly authorized by that [statute] cannot be taken [as official action] since the state authorization for such action is a nullity." *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). Because such suits are not considered suits against the state, they are not barred by the Eleventh Amendment. *Pennhurst State School,* 465 U.S. at 102, 104 S.Ct. at 909; *see also Ex Parte Young,* 209 U.S. at 159–60, 28 S.Ct. at 453–54.

█ To prevent conflict with the Eleventh Amendment, the Supreme Court has required that, when "making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, ... such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state and thereby attempting to make the state a party." *Ex parte Young,* 209 U.S. at 157–58, 28 S.Ct. at

---

1. Some cases imply that the relationship between the claimant and the third party can be more informal if the claimant faces serious injury from the challenged conduct. Although the relationship between a vendor and her clients or between a sex education advocate and his clients do not involve a privileged relationship such as doctor-patient or lawyer-client, the Supreme Court has allowed claimants such as these to argue on behalf of their clients because the claimants in those cases faced criminal prosecution under the challenged statute. *See Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (where the claimant distributed contraceptives to single people in violation of the law); *Craig,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (where alcohol vendor challenged a law restricting alcohol sales to young males).

453. If the state official sued is the governor, as in this case, requiring a connection between him and the enforcement of the statute satisfies the concern of the Supreme Court that

> [i]f, because [he is a] law officer[ ] of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against [him], then the constitutionality of every act passed by the legislature could be tested by a suit against the governor, ... based upon the theory that [he], as the executive of the state, was, in a general sense, charged with the execution of all its laws ... That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

*Fitts v. McGhee,* 172 U.S. 516, 530, 19 S.Ct. 269, 274, 43 L.Ed. 535 (1899). Complying with *Fitts* and *Ex Parte Young,* courts have held that general broad powers to enforce or execute the laws of a state possessed by a state official, alone, are not sufficient to make the officer a proper party defendant. *See Sherman,* 980 F.2d at 441; *Long v. Van de Kamp,* 961 F.2d 151, 152 (9th Cir.1992); *Southern Pacific Transp. Co. v. Brown,* 651 F.2d 613, 614 (9th Cir.1980); *Weinstein v. Edgar,* 826 F.Supp. 1165, 1166 (N.D.Ill.1993).

Unlike the cases cited above, where the only connection between the defendant and the challenged law was the officer's general duty to execute and enforce the law, Governor Bayh does play a role in the operations of the JNC. The governor completes the process of judicial appointment by selecting one of the nominees submitted to him by the Commission. This connection, while indirect, has been found sufficient to overcome the Eleventh Amendment. *See Los Angeles County Bar v. Eu,* 979 F.2d 697 (9th Cir. 1992). In *Eu,* the governor was a defendant in a challenge to a law that limited the number of judicial positions in the county. The appellate court found that the governor had a specific connection to the statute because he had the duty to appoint the judges whenever there was a vacancy. The role of Bayh in this case is not any different from the role of the governor in *Eu.*

As a Ninth Circuit case, *Eu* is not binding in this Court. Nonetheless, as a Court of Appeals' decision, it is persuasive and carries substantial weight. *Cortright v. Thompson,* 812 F.Supp. 772, 776 (N.D.Ill. 1992). Bayh does not suggest any reason of why the Court should ignore that opinion. Accordingly, the Court finds that the Eleventh Amendment does not bar the suit against Bayh.

5. Back does not have a case or controversy against Defendant Bayh.

Defendant Bayh argues that the Plaintiff's suit against him does not meet the case or controversy requirement of Article III of the Constitution. Standing is one of the components of the "case or controversy" requirement. *Defenders of Wildlife,* 504 U.S. at 559–61, 112 S.Ct. at 2136. The standing test as described in *Defenders of Wildlife* requires not only that the plaintiff have a personal stake in the outcome of the suit by requiring a distinct injury, but it also requires that there be an actual dispute between the litigants, by requiring that plaintiff's injury be traceable to the defendant's conduct. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629–30, 57 L.Ed.2d 595 (1978); *NAACP v. California,* 511 F.Supp. 1244, 1261 (E.D.Cal.1981), *aff'd,* 711 F.2d 121 (9th Cir.1983). A federal court cannot act against a defendant to redress injuries that resulted from the independent actions of some third party. *Southern Pacific Transportation Co.,* 651 F.2d at 614.

As discussed above, Back has satisfied the standing requirements in challenging the gender and racial classifications as applied to the JNC attorney members. Although Back has standing to bring this claim in a general sense, he does not have standing to bring it specifically against Governor Bayh. The constitutional injury that Back alleges does not relate to any actions by the governor. Under the new law, the governor is not

responsible for the selection of any of the JNC members.[2] The governor's involvement in appointing a judge from the nominees submitted by the JNC does not affect the composition of the JNC itself. Therefore, nothing that Governor Bayh did or will do regarding judicial nominations caused or will cause the injury that Back alleges. Accordingly, Back's injury is not traceable to any actions by the governor. *See, e.g., Long,* 961 F.2d at 152 (dismissing an action against the attorney general because plaintiff's injury from an illegal search did not result from any action attributable to the officer); *So. Pac. Transp. Co.,* 651 F.2d at 615 (where the advice given by the attorney general to state prosecutors about enforcing the challenged act did not satisfy the Article III requirements because such advice did not mandate enforcement and therefore could not cause injury to the plaintiff); *NAACP v. California,* 511 F.Supp. at 1261 (finding that although the Eleventh Amendment did not bar a suit against the governor, the plaintiff did not have a case or controversy against the governor); *but see L.A. Branch NAACP v. L.A. Unified School District,* 714 F.2d 946, 948 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984) (finding that the plaintiffs had satisfied Article III by alleging that the governor had engaged in intentional acts resulting in school segregation and that some remedy in which the governor could participate was possible).

For the same reasons, a decision against the governor would not redress Plaintiff's injury. An injunction against the governor would not redress the injury caused by the implementation of the allegedly discriminatory criteria for JNC participation because the governor does not decide who are the rightful attorney members of JNC. In the same manner, a declaratory judgment that the racial and gender provisions are unconstitutional, or an injunction ordering that the old JNC members be reinstated, would not affect that duties or the role of the governor under the statute to make judicial appointments.

Dismissing the action against the governor does not leave Plaintiff without recourse. If he prevails in this action, Back may obtain full relief by a declaration that the racial and gender classifications in the amendment are unconstitutional and by an injunction against Defendant Anton who, as the Lake Circuit Clerk, manages and oversees the election of attorney members. *See* Ind.Code § 33–5–29.5–32 and 33.

The Court concludes that the action against Bayh does not present a justiciable case or controversy. Accordingly, the Court **GRANTS** Bayh's motion to dismiss.

Bayh also argues, without citing any supporting law, that the complaint against him fails to state a claim upon which relief may be granted. Because the Court has determined that the suit against Bayh must be dismissed under Article III, the Court will not consider this argument. Likewise, since the Court grants the motion to dismiss, it will not consider Bayh's alternate motion for summary judgment.

6. Back has satisfied the requirements for the issuing of a preliminary injunction in this case. However, the Court will not enjoin all the changes implemented by the 1995 amendment, but only the racial and gender classifications that apply to attorney members.

Before a court grants a preliminary injunction, the petitioner must establish three threshold requirements:

a) he has no adequate remedy at law;

b) he will suffer irreparable harm but for the injunctive relief; and

c) the petitioner has a reasonable likelihood of success on the merits.

*U.S. v. Rural Elec. Convenience Co-Op. Co.,* 922 F.2d 429, 432 (7th Cir.1991); *Milwaukee Cty. Pavers Ass'n v. Fiedler,* 707 F.Supp. 1016, 1021 (W.D.Wis.), *modified on other grounds,* 710 F.Supp. 1532 (1989). The court should deny the motion if the petitioner does not establish these three requirements. *Ab-*

---

**2.** Since the Court ruled that Back does not have standing to challenge the selection process for nonattorney members, the fact that prior to the amendment the Governor appointed the nonattorney members is irrelevant here.

bott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir.1992).

If he succeeds in meeting the three threshold requirements, the court should weigh the irreparable harm threatening the petitioner against the irreparable harm the respondent will suffer if the injunction is granted improvidently. *Rural Elec. Convenience Co–Op.*, 922 F.2d at 432; *Milwaukee Cty. Pavers*, 707 F.Supp. at 1021. If the likelihood of success on the merits by the petitioner is great, the balance of the harm does not need to favor the petitioner as strongly. *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994). Last, the court should consider whether the injunction will harm ·the public interest. *Rural Elec. Convenience Co–Op.*, 922 F.2d at 432; *Milwaukee Cty. Pavers*, 707 F.Supp. at 1021. The petitioner has the burden of persuasion on all the requirements. *Milwaukee Cty. Pavers*, 707 F.Supp. at 1021.

### A. No Adequate Remedy at Law

The injury that Back allegedly suffered due to discrimination is an equal protection injury which is very difficult to compensate with legal remedies. *See, e.g., Milwaukee Cty. Pavers*, 707 F.Supp. at 1033. His position at the JNC is a voluntary nonpaid position. He has not lost any salary or other compensation. This makes it very difficult to assign a monetary value to the injury. Aware of this, Back only asks for injunctive and declaratory relief in this suit. Accordingly, the Court finds that he does not have an adequate remedy at law. *Cf. EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir.1980) (refusing to grant a preliminary injunction for reinstatement in a Title VII discrimination case where plaintiff could be compensated monetarily).

### B. Irreparable Injury

"When violations of constitutional rights are alleged, further showing of irreparable injury may not be required" if what is at stake is not monetary damages. *Milwaukee Cty. Pavers*, 707 F.Supp. at 1032. This rule is based on the belief that equal protection rights are so fundamental to our society that any violation of those rights causes irreparable harm. *Id.* Courts often have found that when a plaintiff in an equal protection case alleged a constitutional injury, the plaintiff satisfied the requirement of irreparable harm. *See Henry v. Greenville Airport Comm'n*, 284 F.2d 631 (4th Cir.1960); *Harrison & Burrowes Bridge Constructors v. Cuomo*, 743 F.Supp. 977, 996 (N.D.N.Y. 1990); *Milwaukee Cty. Pavers*, 707 F.Supp. at 1032; *see also Doe v. Mundy*, 514 F.2d 1179 (7th Cir.1975) (finding that a constitutional violation of due process causes irreparable harm). In the same manner, the Court finds that Back has shown that he faces irreparable harm.

Defendants, however, argue that Plaintiff cannot show irreparable harm because there are no vacancies requiring the JNC to meet. When a judicial vacancy will occur is uncertain, depending on the Lake County judges' retirement or career plans, their health and their luck. Nonetheless, Back arguably was injured when he lost his position on the JNC by the implementation of the amendment. This allegedly unconstitutional termination of his term has occurred irregardless of whether there is now a judicial vacancy. Also, even if the JNC is not actively meeting, Back testified that as secretary of the JNC he performed certain functions for the Commission throughout the year. In addition, the Court does not believe that it is in the best interest of the JNC to wait until a judicial vacancy occurs to decide whether an injunction is appropriate. The JNC must submit the list of nominees to the Governor within 60 days of a vacancy. Ind.Code § 33–5–29.5–35. The Commission should be prepared to respond to a vacancy whenever it occurs without having to wait for a decision of this Court on a preliminary injunction.

Defendants also argue that Plaintiff cannot show irreparable injury because he does not have standing. As discussed above, this Court concluded that Back has standing to challenge the amendment as it applies to attorney members. Last, Defendants argue that Back cannot show any harm because the Indiana General Assembly could terminate his term at will. As discussed above, while the state legislature has the power to terminate Back's term to implement changes in

the Commission, it cannot do so for an unconstitutional purpose, which Back has alleged in his complaint.

### C. Likelihood of Success

 In a motion for a preliminary injunction, the petitioner needs to show that he has a reasonable likelihood of success on the merits. In other words, the petitioner must show that his chance of succeeding is better than negligible.[3] *Milwaukee Cty. Pavers,* 707 F.Supp. at 1022.

 Back challenges the amendment for racial and gender discrimination under the Equal Protection Clause of the Fourteenth Amendment. The statute on its face clearly includes classifications based on race and gender. Courts review laws that impose racial classifications under strict scrutiny. To meet the requirements of the Fourteenth Amendment, such laws must be tailored narrowly to serve a compelling government interest. *Adarand Constructors, Inc. v. Pena,* — U.S. —, —, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995); *City of Richmond v. J.A. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (combining the plurality and the concurring opinions). Courts review laws imposing classifications by gender under an intermediate scrutiny test, requiring that such laws serve an important government objective and be substantially related to the achievement of that objective. *Orr v. Orr,* 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306 (1979); *Heckler v. Mathews,* 465 U.S. 728, 744, 104 S.Ct. 1387, 1397–98, 79 L.Ed.2d 646 (1984); *Personnel Adm. of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1977); *Ensley Branch of NAACP v. Seibels,* 31 F.3d 1548, 1579 (11th Cir.1994); *Contractors Ass'n v. City of Philadelphia,* 6 F.3d 990, 1001 (3d Cir.1993). Although the plaintiff always carries the burden of persuasion, it is up to the party upholding the statute to establish a strong basis in the evidence showing that the statute meets the appropriate standard. *Concrete Works of Colorado v. City and County of Denver,* 36 F.3d 1513, 1521–22 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995); *see also Adarand Constructors,* — U.S. at —, 115 S.Ct. at 2111; *Heckler,* 465 U.S. at 744, 104 S.Ct. at 1397; *Aiken v. City of Memphis,* 37 F.3d 1155, 1162 (6th Cir.1994).

#### (1) Race requirements

 Under strict scrutiny, racial classifications have been held constitutional only when imposed strictly for remedial purposes. *J.A. Croson,* 488 U.S. at 493, 109 S.Ct. at 721–22 (plurality opinion). The courts have found adequate remedial purposes only when the government can show that the classification is a response to specific instances of prior discrimination. *See J. Croson,* 488 U.S. at 492, 109 S.Ct. at 721 (plurality opinion); *see, e.g. Aiken,* 37 F.3d at 1162–63. Remedial efforts can serve to ameliorate the effects of prior discrimination by the government or the effects of the government's passive participation in a system of racial exclusion by private parties. *J.A. Croson,* 488 U.S. at 492, 109 S.Ct. at 721. Without prior discrimination, the government does not have a compelling interest for imposing a racial classification. *J.A. Croson,* 488 U.S. at 499, 109 S.Ct. at 724–25; *Regents of U. of Calif. v. Bakke,* 438 U.S. 265, 309, 98 S.Ct. 2733, 2758, 57 L.Ed.2d 750 (1978) (plurality opinion).

 Although past history of generalized private and public discrimination may have contributed to lack of opportunity for minorities, this alone does not support race-based actions by the government. *J.A. Croson,* 488 U.S. at 499, 109 S.Ct. at 724–25. Remedying such general societal discrimina-

---

**3.** The preliminary injunction requested by Plaintiff would change the position of the parties as it existed at the commencement of the case. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). The Second Circuit has required a greater showing for such mandatory (as opposed to prohibitory) injunction. *Id.* In such circumstances, the petitioner must show clearly that he is entitled to the relief requested and that serious or extreme damage will result otherwise. *Id.;* *see also Harrison & Burrowes Bridge Constructors v. Cuomo,* 743 F.Supp. at 977, 995 (1990) (same higher standard if the injunction will affect the public interest or if the injunction will provide total relief). The Court has not found any Seventh Circuit case requiring different standards for different types of injunction. Accordingly, Plaintiff in this case must show only a reasonable likelihood of success.

tion does not provide a compelling interest. *Bakke,* 438 U.S. at 310, 98 S.Ct. at 2758–59 (plurality opinion); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion). The desire for diversity or to have more minorities is not an interest sufficient to justify governmental race-based actions. *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 (plurality opinion); *Hopwood v. Texas,* 78 F.3d 932 (5th Cir.), *petition for cert. filed,* No. 95–1773 (April 30, 1996). The historical imbalance between minority representation in a profession and the percentage of minorities in the community alone does not provide the government with a compelling interest. *Bakke,* 438 U.S. at 310, 98 S.Ct. at 2758–59 (plurality opinion).

■ When there is a significant disparity between the numbers of minorities willing to serve and those actually serving, such disparity can give rise to an inference of discrimination. *J.A. Croson,* 488 U.S. at 501, 509, 109 S.Ct. at 725, 730 (plurality opinion); *Peightal v. Metropolitan Dade Cty.,* 26 F.3d 1545, 1556 (11th Cir.1994). However, if a position requires special qualifications, the relevant comparison is between those qualified to serve and those selected. *J.A. Croson,* 488 U.S. at 501, 109 S.Ct. at 725–26. Where a position requires special qualifications, statistical comparisons that use the percentage of minorities in the general population are not appropriate to show discrimination.

■ In this case, Defendants did not introduce any direct evidence of racial discrimination. During the hearing, Defendants presented evidence that before the amendment no minority had ever been elected as an attorney member of the JNC. Defendants also introduced evidence of the numbers of minorities in the community and of the numbers of minority lawyers who ran in the elections for JNC membership.

■ The number of minorities in the community at large is irrelevant in this case.

The law requires that the attorney members of the JNC be lawyers. When some specialized training is required for a position, the percentages relevant for statistical purposes are the percentages of qualified minorities.

About ten percent of the lawyers currently in Lake County are minorities. This is an increase from four percent before 1965. Defendants also showed that minority candidates ran for JNC positions in greater proportion than the proportion of minorities among Lake County lawyers. Between fifteen and forty-three percent of JNC candidates have been minorities.

While significant statistical disparity can lead to an inference of specific discrimination, *see J.A. Croson,* 488 U.S. at 501, 109 S.Ct. at 725–26, the Court does not find that the number of minority attorneys compared to the lack of minority representation among JNC attorney members is significant enough to meet the standard of *J.A. Croson,* particularly when the participation in the Commission depends on an at-large election by fellow attorneys.

Evidence at the hearing showed that minority attorneys have never been prevented from registering for JNC elections or from otherwise running in the elections. Defendants admitted that minorities have not suffered intentional discrimination when running for a JNC position. Intervening Defendant's Response, May 8, 1996, p. 6. It is clear that minority attorneys have not found any barriers against participating in the elections, since the percentage of minority candidates is greater than the percentage of minority lawyers. While, theoretically, Defendants could still prove at trial specific instances of discrimination against minority lawyers that have prevented their success in the JNC elections, Defendants have not done so thus far and are probably unlikely to do so, short of introducing evidence of a conspiracy among members of the bar to vote against minority candidates.[4] Because Defendants have

---

4. Even if Defendants could show that the attorneys voting in the election for the JNC membership discriminated in their voting selection, the question remains whether such discrimination can be attributed to the government imposing the racial classification in this case. *See Hopwood v. Texas,* 78 F.3d 932 (5th Cir.1996) (requiring that affirmative action programs imposed by a government actor be limited to remedy past discrimination by *that same* government actor). Attor-

not shown that discrimination has occurred in the election of JNC attorney members, the Court does not find that the government had a compelling interest in establishing racial classifications.

Even assuming a compelling interest, the Court doubts that the amendment would meet the "narrowly tailored" requirement. In this case the legislation imposed a racial classification on attorney membership ·in the JNC without first attempting to increase diversity through racially neutral means. *See J.A. Croson,* 488 U.S. at 507, 109 S.Ct. at 729; *Peightal,* 26 F.3d at 1557. The amendment included other racially neutral changes that might increase diversity in the Commission, such as increasing the number of the commissioners and changing the voting system for attorney members. Without time to observe the effect of these provisions, the Court cannot conclude that the only way to increase minority attorney representation in the Commission, even if assuming specific past discrimination, is through a racial classification.

■■■■ In addition, the fact that the legislation imposed a racial classification indefinitely argues against a finding that the amendment is narrowly tailored to remedy discrimination. Classifications based on race are permissible under the Fourteenth Amendment only to remedy discrimination, and should terminate once this goal is accomplished; otherwise the racial classification can outlive the necessity that justifies its use. *Ensley Branch,* 31 F.3d at 1582;· *Mallory v. Harkness,* 895 F.Supp. 1556, 1562 (S.D.Fl. 1995).

Because Defendants have not shown a compelling government interest in the racial classification in the amendment and have not shown that the amendment is tailored narrowly to satisfy such interest, the Court concludes that Plaintiff has a reasonable likelihood of success on his challenge to the racial classification.

**(2) Gender requirements**

■■■ The JNC amendment requires that two of the attorney members be men and two be women. Despite appearing to impose an equal burden on men and women, the law is not gender neutral. It requires that the gender of an elected attorney member be considered before appointment to JNC. If two women attorneys have been elected to the JNC, any other woman elected will be turned down because of her sex. If two men have been elected, the next man elected will be turned down solely because of his sex. To the extent that the amendment mandates a consideration of gender before appointment, it imposes a classification that is discriminatory on the basis of gender.

■■■ Under the constitutional test for gender classifications, governments can enact gender-based classifications for the purpose of assisting members of a gender that is disproportionately burdened or specially disadvantaged. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975). Some degree of discrimination must have occurred in the particular field targeted by the classification before a gender-specific remedy applies. *Coral Contr. Co. v. King Cty.,* 941 F.2d 910, 932 (9th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992). Unlike strict scrutiny, this intermediate test does not require a showing that the government unit itself engaged in the discrimination it seeks to remedy. *Coral Construction,* 941 F.2d at 932. The government can show an important interest by showing societal discrimination in the relevant field. *Ensley Branch,* 31 F.3d at 1580; *see also Contractors Ass'n,* 6 F.3d at 1010 (stating that the government could satisfy the test by showing economic discrimination against women con-

neys in Lake County are private persons and it would be difficult to attribute their voting preference to Lake County or the State of Indiana. *But see Bradley v. Work,* 916 F.Supp. 1446 (S.D.Ind.1996) (suggesting that the election of attorney members to the Commission by the local bar represents a delegation of executive pow-

er of appointment). Defendants could perhaps show that Lake County was a "passive participant in a system of racial exclusion" if they were able to show actual discrimination by the attorney voters. *See J.A. Croson,* 488 U.S. at 492, 109 S.Ct. at 721.

tractors); *Associated General Contractors v. City and County of San Francisco*, 813 F.2d 922 (9th Cir.1987) (finding an important government interest based in part on a showing of historical discrimination). The fact that the government can enact gender-based, but not race-based, classifications to remedy societal discrimination can lead to the odd result that it is easier to uphold programs that favor women than those that favor minorities. *Ensley Branch*, 31 F.3d at 1579; *see also Associated General Contractors* 813 F.2d 922 (stating that gender-based clarifications do not have to be tailored narrowly).

■ The Supreme Court has not established the significance of gender statistical disparities for gender-based classifications. The Court has upheld laws without requiring statistical evidence and has struck down gender preferences despite statistical evidence. *See Contractors' Ass'n*, 6 F.3d at 1010. The Third Circuit summarized the holdings of the Supreme Court when applying intermediate scrutiny as requiring that the proponents of the law show that it was the "product of analysis rather than a stereotyped reaction based on habit." *Contractors' Ass'n*, 6 F.3d at 1010 (citations omitted). This requires that the government present probative evidence supporting the stated rationale for gender preference. *Id.; see, e.g., Harrison & Burrowes Bridge Constructors v. Cuomo*, 743 F.Supp. 977, 1002 (N.D.N.Y.1990) (finding that without evidence of gender discrimination the government had not shown an important interest justifying a gender classification because simple gender balancing is not an important objective).

■ As with race, Defendants did not present any direct evidence of gender-based discrimination in this case. Defendants introduced evidence showing that about 20% of the Lake County attorneys are women, and that women constitute 52% of the population in the county. If women attorneys constituted twenty percent at all times and none ever were elected, there might be some cause for concern. However, the number of women attorneys in Lake County rose from one percent before 1965 to twenty percent at the present time. While no women ran as candidates in the first three elections, in the last three elections, women candidates represented from ten to thirty percent of the candidates. There is no evidence that women were prevented from registering and running for an attorney position on the JNC. It simply appears that as the percentage of women attorneys increased, so did their participation in the elections. Considering how the percentage of women attorneys in Lake County and the percentage of women running as candidates have varied in recent years, Defendants have not explained to the Court how these numbers are evidence of discrimination against women lawyers in the county, especially since JNC attorney members are selected by election rather than appointed.

The statistics presented by the Defendants could suggest discrimination against the entry of women into law schools and thereafter the legal profession. The proportion of women who are lawyers in Lake County is much smaller than the proportion of women in the community at large, although the disparity narrows when considering the number of women attorneys recently admitted to the bar. While the cases assert that statutes can impose gender-based classifications to remedy societal discrimination in a specific field, the cases do not suggest how far societal discrimination can serve as a rationale for such classification. Discrimination in legal education is one step removed from discrimination in an election among lawyers. While the law could remedy societal gender discrimination in the selection of JNC attorney members, it is less clear whether the law can impose gender classifications to remedy societal gender discrimination in legal education. Without case law from Defendants supporting this type of analysis, the Court will not accept the disparity between the number of women in the community and the lack of JNC women attorney members as sufficient to support an important government interest. Defendants thus far have not succeeded in showing an important government interest supporting the gender classification in the amendment.

■ Even if Defendants could show an important government interest, the Court may not find that the gender classification is

substantially related to an important government interest. The fact that the legislation imposes gender classifications indefinitely argues against a finding of substantial relation. *See Ensley Branch,* 31 F.3d at 1582. A gender classification imposed indefinitely can outlive the interest that justifies its use. *Id.*

In addition, the amendment assigns two attorney positions to each gender without consideration of the percentages of attorneys per gender. If the interest justifying the classification is discrimination against women attorneys during the election, the classification should be tied to the percentage of women attorneys rather than to attempt to strike simple gender balancing. *See Main Line Paving v. Bd. of Educ.,* 725 F.Supp. 1349, 1363 (E.D.Pa.1989) (finding that although the government stated an important objective in the desire to overcome past discrimination against women in construction contracting, the program was not substantially related to that goal because the government presented no statistical evidence to show how women were disadvantaged and because it presented no evidence that any statistical disparity was caused by gender discrimination).

Defendants have not shown an important government objective that relates substantially to the gender classification. Therefore, the Court finds that Back has shown a reasonable likelihood of success on his challenge against the gender classification in the law.

D. *Balancing the Harm*

The 1995 amendment was a response to a movement in the Indiana legislature to abolish the judicial nominating system and reinstate judicial elections in Lake County. One of the reasons for this movement was the criticism that the Commission did not reflect the racial and gender populations in Lake County. If the Court grants Back's request for injunctive relief, Defendants could face another drive to return to judicial elections, despite the recommendations of the Lake County Bar Association that the judicial nominating system results in a more independent judiciary and in a greater pool of applicants for judicial positions. In addition, an improvidently granted injunction will cost Defendants the time and effort needed to dismiss the commissioners currently serving and to reorganize the JNC as it was before the amendment.

If the Court grants the injunctive relief specifically requested by Back, which would enjoin all the changes included in the amendment, such order would enjoin not only the allegedly unconstitutional racial and gender classifications applying to attorney members, but also other changes implemented by the 1995 amendment such as the increase in the number of members in the Commission, the change in the voting system for attorneys, the transfer of the power to appoint nonattorney members from the Governor to the Lake County Commissioners, the clarification that salaried public employees can serve as attorney members, the recommendation that the JNC consider racial and gender diversity when selecting judicial nominees, and the nonattorney gender and racial classifications which this Court concluded that Plaintiff does not have standing to challenge. As with the racial and gender attorney member classifications, these changes were part of an effort to modify the judicial nominating system to prevent a return to judicial elections. Enjoining the operation of the whole amendment would greatly harm Defendants in their efforts to retain the judicial nominating system. If improvidently granted, the injunction would harm the effort of the Indiana legislature to improve the judicial nominating system by increasing diversity in the JNC and by giving greater participation to the community in judicial nominations.

Because of Defendants' interest in maintaining the changes implemented through the amendment, Defendants ask that if the Court decides to grant injunctive relief, the Court should limit the injunction only to the application of the racial and gender specifications for attorney members and not enjoin the operation of the rest of the amendment. Defendants cite Indiana Code § 1-1-1-8, which provides that if any provision of the Code is held invalid, such determination should not affect the validity of the other provisions that can stand by themselves. The invalid provision is severable from the remainder of the statute unless the remainder is inseparably

connected to the invalid provision "that it cannot be presumed that the remainder would have been enacted without the invalid provision." Ind.Code § 1–1–1–8. Each part of a statute is severable. *Id.*

When determining whether an invalid provision is severable, a court must consider whether the legislature would have passed the amendment without the invalid provision. *Ind. Educ. Employment Relations Bd. v. Benton Community School Corp.*, 266 Ind. 491, 365 N.E.2d 752, 760 (1977). "Legislative intent determines whether the invalid part of [an act] is severable from the valid part." *Ind. Waste v. Bd. of Comm'rs of Cty. of Howard*, 180 Ind.App. 385, 389 N.E.2d 52, 61 (1979). Absent a nonseverability clause, Indiana Code § 1–1–1–8 creates the presumption for all the provisions of the Code that the legislature intended the rest of the statute to remain in effect despite an invalid provision. *Alliance for Clean Coal v. Bayh*, 888 F.Supp. 924, 937 (S.D.Ind.1995), *aff'd*, 72 F.3d 556 (1996); *see also Clem v. Steveco, Inc.*, 450 N.E.2d 550, 553 (Ind.Ct.App.1983) ("[T]he remedy, assuming the provision is unconstitutional, is to strike the offensive provision and not declare the entire act unconstitutional.").

Plaintiff argues only in a cursory manner that the 1995 amendment is incomplete and incapable of execution absent the provisions containing the racial and gender classifications. This is not sufficient to overcome the presumption of severability.

The Court finds that the provisions in the 1995 amendment are severable. The elimination of the gender and racial classification for attorneys from the statute does not prevent the successful implementation of the other changes in the amendment. To hold otherwise effectively would prevent the legislature from enacting any changes in response to criticisms to the judicial nominating system. For example, the change in the appointment of nonattorney members clearly is completely independent from the provisions including racial and gender classification in attorney member selection. This change implemented by the amendment responded to the specific criticism that nonattorney members should not be appointed by the governor because this increases the power of the governor in judicial nominations.

Also, although the Indiana legislature cannot respond to criticism that the JNC did not reflect the racial and gender composition of the community by enacting gender and race classifications if these classifications are indeed unconstitutional, nothing prevents the legislature from encouraging greater diversity in the JNC through race-neutral and gender-neutral actions that do not violate the Fourteenth Amendment. *See J.A. Croson*, 488 U.S. at 509, 109 S.Ct. at 730 (plurality opinion, stating that even in the absence of evidence of discrimination a city can act with race-neutral means). Increasing diversity and community participation appear to be the intended effects of several of the changes implemented by the statute, such as increasing the number of the JNC members and changing the voting system for attorney member elections. The Court would tie the hands of the Indiana legislature if it held that gender and racial classifications are unconstitutional and at the same time held that the race-neutral and gender-neutral changes that a legislature can enact constitutionally are not sufficiently complete to stand on their own.

Evidence presented at the hearing showed the importance of the other changes in the legislation for the Lake County Bar Association, which spearheaded the changes in the statute. The Court makes no findings with regard to the priority of the changes implemented by the amendment, but it does find that such changes were important enough on their own that the legislature would have enacted the law even without the gender and racial classifications in attorney member selection.

Back did not challenge in his complaint or during the hearing any other sections of the amendment besides the racial and the gender classifications. While the Court has concluded that he had a substantial likelihood of success on the merits in his challenge to those sections, Back has not shown that he has a possible likelihood of success on the merits in challenging other provisions.

In balancing the harms to the parties when deciding whether to grant a preliminary injunction, the court should consider the injuries of the parties if some intermediate form of relief is granted. *See Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 17–18 (7th Cir.1992). Based on what the parties have shown up to this point, the Court may find in its final judgment that the gender and racial classifications in attorney member selection are unconstitutional without disturbing the rest of the changes implemented through the amendment. Such a decision would redress Back's injury. His alleged injury consists of the premature termination of his term as a JNC attorney member for an unconstitutional purpose. As stated above when discussing standing, the Indiana legislature has the power to terminate his term in order to implement changes in the JNC as long as it does not do so for an unconstitutional purpose. Striking the allegedly unconstitutional classifications in the statute still permits the Indiana General Assembly to terminate Back's term to implement changes not held unconstitutional. While such conclusion by the Court would not restore Back to his JNC position, it would redress his equal protection injury. *See Heckler v. Mathews*, 465 U.S. at 740, 104 S.Ct. at 1395–96 ("[W]hen the 'right invoked is that to equal protection,' the appropriate remedy is a mandate of equal treatment," even if plaintiff does not succeed in obtaining the benefit he requested when he challenged the statute.); *see also Orr v. Orr*, 440 U.S. at 273, 99 S.Ct. at 1108–09 (stating that a federal litigant may win a constitutional challenge without ultimately winning the relief he specifically requested).

Because the Court may decide this case by declaring unconstitutional only the race and gender quotas applied to attorneys, the Court will not grant Back the injunctive relief as he requested, for it would award him greater relief than the Court may decide at final judgment. The Court, however, finds that Back has satisfied the requirement for injunctive relief enjoining the operations of the gender and racial classifications in attorney member selection. Granting such an injunction would prevent the irreparable harm caused by his injury because it would remedy the unconstitutional aspect of the amendment. At the same time, the harm to the Defendants would be minimal if such limited relief were granted because the JNC could continue in its current operation with only a few modifications. Most of the changes included in the amendment would remain in effect.

Enjoining only the operation of the gender and racial classifications as applied to attorney members will allow the JNC to continue to operate without changes except for one attorney position for which two male attorneys tied for fourth place in the election held in September 1995. That position was filled by holding a separate election to choose a female lawyer. The gender quota clearly affected that attorney position because it forced the attorney candidate who received the fourth greater number of votes out of his rightfully won position.

The other three attorneys now on the Commission are the candidates who received the majority of votes in the regular election. Back does not claim that the manner in which the election was conducted or the choices the attorneys made while voting were affected by the allegedly discriminatory clauses. At the hearing, he did not present any evidence that the amendment may have tainted the election. Therefore, the Court does not find that it has to change the structure of the JNC or alter the result of the 1995 election other than the one position mentioned.

C. *Public Interest*

The Court has found that Back has a likelihood of succeeding in showing that the race and gender classifications in the statute are unconstitutional. Unconstitutional legislation is not in the public interest. *Milwaukee Cty. Pavers Ass'n*, 707 F.Supp. at 1034. Therefore, it would be in the public interest to enjoin the operation of the allegedly unconstitutional provisions.

However, it would not be in the public interest to enjoin other changes implemented by the 1995 amendment, which were legitimate legislative decisions with the aim to improve the operation of the judicial nomi-

nating system. Since the Court has concluded the racial and gender classifications as they apply to attorneys are severable from the rest of the amendment, nothing in the public interest supports enjoining the operation of the whole amendment. The public interest will be served best if the Court enjoins the allegedly unconstitutional provisions without affecting the other changes in the statute. In accordance with the analysis above, the Court **GRANTS IN PART** and **DENIES IN PART** the relief requested by Back. The Court enjoins the operation of the gender and racial provisions affecting the selection of attorney members. The attorney members currently serving at the JNC should be the four people who received the highest number of votes in the 1995 election without regard to their gender or race. The Court **DENIES** the request for injunctive relief against the other provisions implemented in 1995. Because the Court finds that the Indiana General Assembly had the power to terminate Back's tenure on the JNC to implement the other provisions of the amendment, the Court will not reinstate Back to the JNC.

In his memorandum, Back asks the Court to declare that the law as amended is unconstitutional. Such a formal declaration, limited by this opinion to the gender and race quotas for attorney members, will have to wait until trial or for a decision on the merits. This order only concludes that the Plaintiff has a reasonable likelihood of success on the merits in his challenge to gender and racial classifications as applied to attorney members.

Defendants ask that Back be required to post a bond to satisfy any harm arising from an improperly granted preliminary injunction. *See* Fed.R.Civ.P. 65(c) (requiring a security before granting a preliminary injunction). Considering that the injunctive relief awarded by the Court is limited, any security provided by Plaintiff should also be limited. The injunction granted by the Court may require that Defendants decide a tie between the two candidates that tied for the last JNC

attorney position in the September election and replace the current fourth attorney member of the Commission.[5] The Court will require Plaintiff to provide security for the cost of these actions to Defendants. The parties should submit briefs to the Court suggesting a proper amount for the bond within thirty days of this order.

7. Defendants are not entitled to judgment as a matter of law in Back's challenge to the race and gender classifications imposed on JNC attorney members.

All Defendants filed motions for summary judgment. The Court **DENIES** the motion filed by Clay, Niemeyer, and Katic as **MOOT** since the Court granted their motion to dismiss. The other two motions are **GRANTED IN PART** with respect to Back's challenge to the provisions affecting the appointment of nonattorney members, because the Court concluded above that Back does not have standing to challenge these provisions. The motions are **DENIED IN PART** with respect to the gender and racial classifications affecting the election of attorney members. The Court has concluded, as discussed above, that Plaintiff has standing to challenge those provisions. The Court also concludes that even if it assumed that all the facts as presented by the Defendants are true, Defendants are not entitled to judgment as a matter of law under the constitutional standards discussed above.

## CONCLUSION

For the reasons set forth below, the Motion for Preliminary Injunction is **GRANTED IN PART** and **DENIED IN PART.** The Court enjoins the application of the race and gender classifications in the selection of JNC attorney members. The Court does not enjoin any of the other changes implemented by the 1995 amendment, and the Court will not order that Back be reinstated in the Commission. The Motion to Consolidate is **DENIED;** the Motions to Dismiss or for Summary Judgment filed by Bayh is **GRANTED;** the Motion to Dismiss filed by Defendants Clay, Niemeyer, and Katic is

---

5. Indiana Code § 33–5–29.5–32(I) indicates that the Clerk of the Lake Circuit Court can decide a tie without holding a run-off election.

GRANTED; the Motion for Summary Judgment filed by Clay, Niemeyer, and Katic is **DENIED AS MOOT;** and the two remaining Motions for Summary Judgment are **DENIED IN PART** and **GRANTED IN PART.** Those motions are **GRANTED IN PART** because Back does not have standing to challenge the racial and gender classifications as applied to nonattorney members. The motions are **DENIED IN PART** because Back does have standing to challenge those classifications as applied to attorney members.