**Hilbert L. BRADLEY, et al.,
Plaintiffs–Appellants,**

v.

**Frederick T. WORK, et al.,
Defendants–Appellees,**

**Randall T. Shepard, et al., Intervening
Defendants–Appellees.**

No. 96–2241.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1997.

Decided Aug. 31, 1998.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The ultimate question presented in this appeal is whether § 2 of the Voting Rights Act, 42 U.S.C. § 1973, applies to the way in which judges for the Superior Court of Lake County, Indiana, are selected, and if so whether the Act has been violated. Prior to reaching that issue, however, we must work our way through a series of procedural obstacles that arose largely because of the plaintiffs' lack of attention to the rules governing litigation in the Southern District of Indiana and the taking of appeals to this court. Briefly, we conclude: (1) this appeal is properly before us, (2) the district court did not abuse its discretion on a number of evidentiary points, (3) the district court was entitled to refuse to grant a motion under Federal Rule of Civil Procedure 59(e) to alter its judgment, (4) while the Voting Rights Act applies to judicial retention elections in Lake County, the court properly granted summary judgment for the defendants, and finally (5) this appeal is not so frivolous, nor was appellants' counsel's behavior quite contumacious enough, to warrant the sanctions appellees have requested (this last decision is one we see no need to further belabor).

**I**

The plaintiffs here describe themselves as "black citizens, residents of Lake County, Indiana, and registered voters." See *Bradley v. Work*, 916 F.Supp. 1446, 1449 (S.D.Ind.

1996), quoting Fifth Amended Complaint. As the district court did, we will refer to them as "the Voters." Lake County, located in the northwestern part of Indiana, has a significant African–American population. At the time of the 1990 Census, African–Americans accounted for 116,688 out of the county's 475,594 residents, or about 24.5%, and accounted for 22.5% of the voting age population. The Voters brought this case in August 1991 to challenge the process of appointing and electing judges in Lake County—a process that they claimed had produced a disproportionately low number of African–American judges.

Most Lake County Superior Court judges (those in the Civil, Criminal, and Juvenile Divisions) are selected under the hybrid system known as the "Missouri Plan." Ind.Code §§ 33–5–29.5–26, –39, –42; see also *Nipper v. Smith*, 39 F.3d 1494, 1500–01 (11th Cir.1994); Jay A. Daugherty, *The Missouri Non–Partisan Court Plan: A Dinosaur on the Edge of Extinction or a Survivor in a Changing Socio–Legal Environment?*, 62 Mo. L.Rev. 315 (1997). (Judges in the County Division are instead elected at-large in county-wide elections, Ind.Code § 33–5–29.5–42.5, an arrangement not relevant to this appeal.) Under the Lake County version of the Missouri Plan, for each judicial vacancy a nominating committee sends three names to the Governor of Indiana, who makes the final selection. Appointees then face retention elections, after approximately two years and then again every six years. Ind.Code § 33–5–29.5–41.

Indiana Code § 33–5–29.5–36 requires the nominating committee to use certain factors to evaluate candidates. In 1995, the statute was amended to add a new requirement: that the committee "consider that racial and gender diversity enhances the quality of the judiciary." *Id.*, as amended by 1995 Ind. Acts 18, § 73. Until the 1995 amendment, the committee included three non-attorney members appointed by the Governor, three attorney members elected by all practicing attorneys in the county, and the Chief Justice of Indiana or his or her designee. The 1995 amendment expanded the committee's membership to nine, of whom four must be attorneys elected by the local bar, four must be non-attorneys appointed by the Lake County Board of Commissioners, and the last is the Chief Justice or his or her designee. Ind. Code § 33–5–29.5–29, as amended by 1995 Ind. Acts 18, § 68. Furthermore, the 1995 amendment bent over backwards to achieve diversity. It required that of each foursome, two be male and two female, and that one of each foursome be a "minority individual," which is defined for these purposes as "an individual identified as black or Hispanic." Ind.Code §§ 33–5–29.5–29, 20–1221.7–4. (After several attorneys in Lake County challenged the 1995 amendment, the district court preliminarily enjoined the operation of that part which created gender and ethnicity quotas for attorney members of the nominating committee, *Back v. Carter*, 933 F.Supp. 738 (N.D.Ind.1996), and later permanently enjoined the same part, *Back v. Carter*, No. 95–CV–288 (N.D.Ind. Sept. 17, 1996) (order entered by stipulation), decisions never appealed to this court.)

The present case initially involved several challenges to the system of judicial selection in Lake County, but the only issue that the Voters have raised on appeal is whether the system of appointment plus retention elections for the Superior Court judges (other than the County Division group) violates either the Voting Rights Act or the Constitution. Implicit in that question is the more fundamental one—whether the Voting Rights Act applies at all to the retention election phase of the Lake County process.

**II**

As we noted earlier, we must first dispose of some procedural issues before turning to the merits. First, we must decide whether the Voters' notice of appeal was adequate to bring the case before this court. Second, the Voters challenge Judge McKinney's decision to exclude several affidavits from evidence when he ruled on the parties' summary judgment motions, in particular an affidavit from Dr. Leonard Moore, an historian who offered to provide background about racial discrimination in Lake County and the history of the appointment and retention system there. Third, the Voters argue that the district judge abused his discretion when he refused

to grant their motion to alter the judgment under Federal Rule of Civil Procedure 59(e), on the ground that the "new" evidence they wished to present had been available to them earlier.

■ Rule 3(c) of the Federal Rules of Appellate Procedure requires that a notice of appeal "name the court to which the appeal is taken." It is clear from the record that the Voters' notice of appeal did not do this. (The Voters had numerous other problems complying with the rules of appellate procedure, among them failing to name the defendants correctly and taking four tries to file a brief that complied with all relevant rules, the final version of which we accepted only after their attorney agreed personally to pay appellees' attorney fees resulting from the unacceptable filings. This is a disturbing pattern, and one that we do not condone.) Nevertheless, even though Rule 3(c) makes the naming of the court mandatory, see *Smith v. Barry*, 502 U.S. 244, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992), the rule goes on to say that "[a]n appeal will not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." Fed. R. App. P. 3(c). This court has held that it will not dismiss on mere technicalities, including in the naming of the court to which a judgment is being appealed, if the notice as a whole is not misleading. See *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1125 (7th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997).

Here, the notice of appeal named and was filed in the U.S. District Court for the Southern District of Indiana on May 16, 1996. The clerk of that court promptly forwarded the papers to this court, as it is required to do under Federal Rule of Appellate Procedure 3(d), under the logical assumption that this court was the one to which the appeal was being taken. *See* 28 U.S.C. §§ 41, 1294. On May 30, 1996, this court issued a Rule To Show Cause to the appellants because they had not as of then filed their Rule 3(c) docketing statement. By return letter the same day, served on opposing counsel, the appellants filed their docketing statement, which clearly indicated that the appeal was lodged in the Seventh Circuit. While we consider this to be on the margins of "informality of form," (appellees point out that appeals from certain cases under the Voting Rights Act lie directly in the Supreme Court, see, *e.g.*, 42 U.S.C. §§ 1973b(a)(5), 1973c), we conclude that it was adequate to bring the appeal to this court, *Ortiz*, 94 F.3d at 1125, and we proceed to the Voters' procedural arguments.

■ The district court explained its evidentiary rulings briefly, without referring specifically to the particular affidavits or other materials the Voters wished to use in support of their case:

The motions to strike various pieces of evidence offered by the plaintiffs in opposition to or support of the motions for summary judgment are well-taken and to the extent that the proffered evidentiary materials contain inadmissible hearsay, lay opinions, speculations, or conclusions, they are stricken. In addition, because the plaintiffs failed to provide the Court with any sort of guide by which to navigate the maze of evidentiary submissions, or with which to connect the various pieces of evidence with the proposed "material facts related to" the various summary judgment motions, the proffered evidence is less than helpful. See *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994) (the statements and designations required by local rules provide "roadmaps," without which the court should not have to proceed).

The plaintiffs mistake the Supreme Court's admonition not to apply the [*Thornburg v.*] *Gingles* [478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)] factors in a mechanical fashion, for permission to ignore the Federal Rules of Procedure and this District's local rules....

... [T]he Court will not refer to any evidentiary materials that are not properly designated as supporting a particular material fact.

*Bradley*, 916 F.Supp. at 1449 (footnote omitted). This excerpt reveals that the district court had two grounds for disregarding the evidence: first, the plaintiffs failed to comply with S.D. Ind. Local Rule 56.1, which specifies the way in which evidence must be pre-

sented to the court for summary judgment motions, and second, much of the evidence would have been inadmissible even if the plaintiffs had properly complied with Local Rule 56.1. Because we find that the district court was within its discretion to insist on compliance with Local Rule 56.1, see *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994) (collecting cases where we have "repeatedly upheld the strict enforcement" of Local Rule 56.1 and its ilk); *Kunik v. Racine County*, 106 F.3d 168, 174 (7th Cir.1997); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995), we need not delve into the record and try to guess which parts of the Voters' submissions were "inadmissible hearsay, lay opinions, speculations, or conclusions," and whether anything left over would have been enough to defeat the defendants' motion.

Local Rule 56.1 states, in pertinent part:

In the text of the supporting brief or an appendix thereto, filed in support of a motion for summary judgment pursuant to Local Rule 7.1, there shall be a "Statement of Material Facts," supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue. In addition, as separate documents, the moving party shall file proposed findings of undisputed fact and conclusions of law, and a proposed summary judgment. Any party opposing the motion shall, within fifteen (15) days from the date such motion is served upon it, serve and file any affidavits or other documentary material controverting the movant's position, together with an answer brief that shall include in its text or appendix thereto a "Statement of Genuine Issues" setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated.

Key to this system, which is typical of the local rules governing summary judgment in this circuit, is the act of specifically correlating evidence in the record to factual propositions. See *Little*, 71 F.3d at 641. Without knowing that basic information, it is impossible to say whether a particular piece of evidence would be properly admissible or not. For example, the Voters insist that the judge should have considered Dr. Moore's affidavit, but for what purpose? Dr. Moore is an historian, and his affidavit set forth extensive information about the history of official discrimination against African–Americans in Lake County. He also recounted the history of racial discrimination within political parties in the area, in Indiana's state government, and in the schools. He provided an historical backdrop to the County's change from direct popular election of Superior Court judges to the appointment and retention system, noting that the latter system was adopted immediately after Gary, Indiana, Mayor Richard Hatcher (an African–American) had been re-elected to office. Last, he provided demographic information suggesting that the appointment and retention system was being used only in the five counties which together accounted for more than 80% of the state's African–American population.

█ We do not exclude the possibility that at least some of Dr. Moore's testimony might have been relevant to one or more issues before the court. (Indeed, even the district court apparently did not strike his affidavit in its entirety.) But it is not our job, any more than it was the district court's job, to figure out for which issues which parts of his testimony might have been admissible. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir.1997). The Voters now argue that historical context can help prove intent to discriminate, but this point comes too late in the day to be of help to them. Furthermore, the fact that intent is an issue does not automatically make the full submission competent, relevant evidence on that point. The same problems we have noted with Dr. Moore's affidavit occur with respect to the affidavits of State Representatives Charlie Brown, John L. Howard, and Henry Bennett, all of whom wished to bear witness to the long history of discrimination in the County. Last, the district court refused to consider certain newspaper articles and excerpts from books. Bearing in mind that the standard of review with respect to evidentiary rulings is

abuse of discretion, even when we are reviewing the grant of summary judgment, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742, 744 (7th Cir.1997), we cannot conclude that such an abuse would have existed here even without the violation of Local Rule 56.1.

■ We also find no abuse of discretion—the appropriate question, see *Britton v. Swift Transp. Co.*, 127 F.3d 616, 618 (7th Cir.1997)—in the district court's refusal to allow the Voters to supplement the record through their Rule 59(e) motion to alter or amend the judgment. The materials the Voters wanted to add were the pleadings in a very similar case, *Hatcher v. Anton*, No. 2:95–CV–271 (N.D.Ind.), filed approximately 30 days before judgment was granted in this case. The Voters intended with these pleadings to show that the defendants were taking inconsistent positions in the two cases. As the district court pointed out in its order, however, this allegedly "new" evidence was available to the Voters before the court entered judgment in their action; indeed, the same lawyer was representing the plaintiffs in both cases. (The court also disputed the alleged inconsistency between these pleadings and its earlier judgment.) This was certainly not the kind of *new* evidence that would have compelled the district court to reconsider its earlier decision, and the court's ruling easily fell within the boundaries of its discretion to manage this case.

### III

■ We therefore come, at last, to the merits of this case: did the district court correctly grant summary judgment for the defendants. As we noted at the outset, the only questions on the merits remaining now are whether the system of appointment plus retention elections for the Superior Court judges (other than the County Division group) violates either the Voting Rights Act or the Constitution, assuming that the Voting Rights Act applies at all to the retention election phase of the Lake County process. While the Voters at one point argued that the Voting Rights Act also applied to the nomination process, they have abandoned that claim on appeal. That is just as well, since the Supreme Court commented in *Chi-*

*som v. Roemer*, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), that a state could avoid the Voting Rights Act altogether by using a system of appointed judges. *Id.* at 401, 111 S.Ct. 2354. But in any event, we have no need to consider anything here but the retention election itself: the process by which judges on the bench must have their names appear on the ballot, for the voters to cast a vote of "yes" or "no" in response to the question whether Judge X should continue to serve.

In *Chisom*, the Supreme Court held that there is nothing special about *judicial* elections that automatically exempts them from the Voting Rights Act. The Court held that § 2 of the Voting Rights Act applies to state judicial elections, even though judges do not "represent" anyone in the same way a legislator does, and even though the Court had already held that the one-person, one-vote principle does not apply to judicial elections. *Wells v. Edwards*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973), summarily affirming 347 F.Supp. 453, 454 (M.D.La.1972) (three-judge district court); see also *Chisom*, 501 U.S. at 402, 111 S.Ct. 2354. Chisom also emphasized the breadth of the language of § 2, see 501 U.S. at 403–04, 111 S.Ct. 2354, which says:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . .

42 U.S.C. § 1973(a). The term "vote" is defined in the statute as including "all action necessary to make a vote effective . . . with respect to candidates for public or party office and propositions for which votes are received in an election." 42 U.S.C. § 1973(c)(1).

The retention elections stage of the Lake County process satisfies this definition of voting, and thus is governed by § 2 of the Voting Rights Act. Viewed one way, judges seeking to retain their positions are "candidates for public office"; if they do not receive enough "yes" votes, they will lose their positions just as surely as an incumbent candi-

date for a legislature, school district, or mayor would. Viewed another way, the voters are being asked in the case of retention elections to vote on a "proposition": do you think that Judge X has done a good enough job to deserve continuation in office? It may be a bit unseemly to think of the question of judicial retention as fundamentally the same as a bond issue or a proposal to amend the state's constitution, but in places following the Missouri Plan these questions have the critical characteristic in common: it is the voters directly who make the choice, through the casting of their ballots. That is what the Voting Rights Act is all about. Since, after *Chisom*, it is not open to us to question whether the electoral model makes any sense for the judicial branch of government, we conclude that § 2 applies in principle to retention elections. See also *African–American Voting Rights Legal Defense Fund, Inc. v. Missouri*, 994 F.Supp. 1105, 1122 (E.D.Mo. 1997), *aff'd. mem.*, 133 F.3d 921 (8th Cir. 1998) (§ 2 applies to retention elections).

In order to prove a § 2 vote dilution claim, the Voters would first need to show that the minority group they represent satisfies the three *Gingles* criteria: geographical compactness, political cohesion, and bloc voting by the majority group. *Gingles*, 478 U.S. at 50–51, 106 S.Ct. 2752; see also *Abrams v. Johnson*, 521 U.S. 74, 117 S.Ct. 1925, 1936, 138 L.Ed.2d 285 (1997) (reaffirming the use of the *Gingles* test). If those preconditions are met, the court must then "consider[ ] whether, on the totality of the circumstances, minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice." *Abrams*, 117 S.Ct. at 1936 (internal quotations omitted).

The district court assumed, without making detailed findings, that the Voters had satisfied the three preliminary *Gingles* criteria, and moved directly to the totality of the circumstances inquiry. It then decided that, since the Indiana Legislature had altered the system for nominating judges during the course of this litigation, see 1995 Ind. Acts 18, and because the nomination system would affect the retention process, it should not issue a declaratory judgment on either the old, superseded electoral process, or the new, untested one. 916 F.Supp. at 1463, citing *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972) and *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). We agree that given the extent and timing of the change in statutory scheme any challenge the Voters might have had to the former system is now moot, *cf. Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 662–63 & n. 3, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), and that the district court appropriately found that the record was too thin to support declaratory relief against the new system. (The fact that a district judge enjoined parts of the operation of the revised statute in 1996 in *Back v. Carter, supra*, does not alter our analysis. Most of the legislative revisions were not enjoined, and in particular the legislature's addition of diversity as a factor to take into account and its decision to transfer the power to appoint the non-attorney members from the governor to the local county commissioners was left undisturbed.) As the district court found, many of the Voters' concerns regarding the retention election process depend directly on who is appointed, a process about which the evidence in the record is now, understandably, uninformative. Future litigation may prove that the "totality of the circumstances" under the revised system shows a violation of the mandates of the Voting Rights Act. At that point, the parties could propose alternate means to rectify the violation from the menu of remedies typical of Voting Rights Act cases, properly tailored to this situation. *Cf. Houston Lawyers' Ass'n v. Texas Attorney Gen.*, 501 U.S. 419, 423, 426, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991); *Barnett v. City of Chicago*, 141 F.3d 699, 705–06 (7th Cir.1998); *Hastert v. Illinois State Bd. of Election Comm'rs*, 28 F.3d 1430, 1435–36 (7th Cir. 1993). The record in this case does not show any violation of the Act, however, so we need not consider the appropriateness of specific remedies.

Furthermore, it is not at all clear that the Voters can satisfy the third *Gingles* factor, bloc voting by the majority group. Appellees have pointed out that both of the African–

American candidates who have faced retention elections were retained, with a majority of white voters supporting each. Two African–American judges were also elected to the county division in at-large races, again with a majority of white voters supporting them. We recently held in *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 853, 139 L.Ed.2d 753 (1998), that a state may have a legitimate interest in using at-large, county-wide districts for judges. More importantly, the court in *Milwaukee Branch of the NAACP* found that the third *Gingles* factor was not satisfied because the record did not establish that white voters in Milwaukee had consistently voted against black candidates. *Id.* at 1198–99. Even taking all inferences favorably to the Voters, the record here is the same. Recall that we are not reviewing anything about the process by which names appear on the ballot: we are reviewing only the retention elections. The evidence in the record can only be read to support the proposition that white voters in Lake County do support African–American judicial candidates in sufficient numbers to assure the election (or retention) of those candidates. It was the Voters' burden to show that the new Lake County system was likely to fail them, and they simply have not done so.

The Voters have not preserved their independent arguments under the 14th and 15th amendments to the U.S. Constitution for appeal, and thus we consider those points waived. As with the Voting Rights Act claims, in addition, the change in the statute is practically fatal to their claims. Finally, even if those claims were before us, if the Voters cannot succeed under the Voting Rights Act it is hard to imagine how they could nevertheless show the intentional discrimination that is required to prove a constitutional violation. See *Smith v. Boyle*, 144 F.3d 1060, 1063–64 (7th Cir. 1998).

We therefore AFFIRM the judgment of the district court.

MANION, Circuit Judge, concurring.

Circuit courts in Indiana are established by the Indiana Constitution. Indiana Const. art. VII, § 7 ("[A]nd a judge for each circuit shall be elected by the voters thereof."). The legislature has created in many counties superior courts which hold the same jurisdiction as circuit courts. All circuit court judges are chosen in partisan elections. In most counties superior court judges are also elected. However, several of the most populous counties which have a number of superior courts, including Lake County, follow some version of the "Missouri Plan" which requires nomination of candidates by a committee followed by the appointment of one of the nominees by the Governor. When each judicial term expires the sitting judge who desires to remain on the bench is placed on the ballot in the general election for "retention," a "yes" or "no" vote.

I am not persuaded that Section 2 of the Voting Rights Act applies to judicial retention votes, in principle or otherwise. Under the "Missouri Plan" for judicial appointments, the voters never "elect representatives of their choice." 42 U.S.C. § 1973(b). Rather, the Governor always selects who will actually fill the vacancies on the Lake County Superior Court. The most the voters can say is "Pick another candidate;" they can never say (through the ballot box) "Pick *this* candidate." This explains why a state "could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed...." *Chisom v. Roemer*, 501 U.S. 380, 401, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Although a retention vote may not enable "judges to be indifferent to popular opinion," *id.*, Missouri Plan judicial appointment schemes appear to fall outside of the plain language of § 2 of the Voting Rights Act which assumes a voter choice.

The inapplicability of § 2 of the Voting Rights Act can also be seen when examining the remedy. Proof of a proper remedy is part of the plaintiffs' prima facie case. *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir.1998). Even if the plaintiffs could demonstrate racially polarized voting and other relevant factors to a finding of liability under the Voting Rights Act, no remedy exists which the federal court could provide. A federal court may not "abolish a particular form of govern-

712

ment and ... use its imagination to fashion a new system. Nothing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government; moreover, from a pragmatic standpoint, federal courts simply lack legal standards for choosing among alternatives." *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir.1994) (en banc) (plurality). We have no power to order Indiana to elect its judges. Moreover, federal courts cannot change the size of the governmental body at issue. *Holder v. Hall*, 512 U.S. 874, 881, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality). Lake County's superior court judges serve the entire county, and Indiana has a substantial state interest in maintaining retention elections which mirror the jurisdiction of the circuit judges. This also weighs against any alternate court-imposed remedy. In short, the federal courts cannot provide a remedy for a § 2 violation without either changing the appointment process or ordering the Lake County courts to reconstitute themselves. As neither are proper remedies under the Voting Rights Act, I would conclude that § 2 of the Voting Rights Act does not apply to judicial retention votes such as in Lake County. In all other respects, I concur in the Court's opinion and concur in the result.