**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH KIRK; CARL EKSTROM;
MICHAEL MILLER,
       *Plaintiffs-Appellants,*

v.

CHIEF JUSTICE WALTER CARPENETI,
in his official capacity as ex
officio Member of the Alaska
Judicial Council; JAMES H.
CANNON, in his official capacity as
Attorney Member of the Alaska
Judicial Council; KEVIN
FITZGERALD, in his official capacity
as Attorney Member of the Alaska
Judicial Council; LOUIS JAMES
MENENDEZ, in his official capacity
as Attorney Member of the Alaska
Judicial Council; WILLIAM F.
CLARKE, in his official capacity as
Non-Attorney Member of the
Alaska Judicial Council; KATHLEEN
THOMPKINS-MILLER, in her official
capacity as Non-Attorney Member
of the Alaska Judicial Council;
CHRISTENA WILLIAMS, in her
official capacity as Non-Attorney
Member of the Alaska Judicial
Council,
       *Defendants-Appellees.*

No. 09-35860

D.C. No.
3:09-cv-00136-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

16643

Argued and Submitted
July 29, 2010—Anchorage, Alaska

Filed September 30, 2010

Before: Mary M. Schroeder, Diarmuid F. O'Scannlain and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Schroeder

## COUNSEL

Joseph Vanderhulst, Terre Haute, Indiana, for plaintiffs-appellants Kenneth Kirk et al.

Jeffrey M. Feldman, Anchorage, Alaska, for defendants-appellees, Chief Justice Walter Carpeneti et al.

## OPINION

SCHROEDER, Circuit Judge:

Since statehood in 1959, Alaska has selected its state judges through a system generically and popularly known as "merit selection." The Governor appoints judges from a list of nominees selected from all applicants by a merit selection commission. In Alaska, all judges must be lawyers. Lawyers therefore play a significant role on the merit selection commission. The commission, known as the Judicial Council, is chaired by the Chief Justice of the Alaska Supreme Court and

composed of six additional members — three lay members appointed by the Governor and confirmed by the Legislature, and three attorney members appointed by the Board of Governors of the Alaska Bar Association. The Board is the Association's governing body and membership in the Association is mandatory for all lawyers practicing in the state.

This suit is an attack on Alaska's merit selection system, brought by a group of individuals seeking to establish the principle that all participants in the judicial selection process must either be popularly elected, or be appointed by a popularly elected official. Thus, Plaintiffs seek to enjoin operation of the Alaska system because three members of the Judicial Council are appointed by the governing body of the Alaska Bar Association, which is in turn elected by the Bar membership and not by the public at large.

Plaintiffs are hard-pressed to find legal support for the principle they seek to establish. In the district court, Plaintiffs urged that the selection of the Alaska Bar Association's Board of Governors by lawyers amounted to a violation of equal protection. The district court dismissed the action, holding that the election of the Board of Governors, and the Board of Governors' appointment of three lawyers to the Judicial Council, did not constitute a violation of equal protection because the role assigned to lawyers was rationally related to the State's interest in selecting a qualified judiciary composed of lawyers.

On appeal, Plaintiffs touch upon a number of legal principles discussed in various election cases. None of their arguments leads to any different result than that reached by the district court. The legal principle Plaintiffs ask the courts to establish is in fact a change in policy that requires amendment to the Alaska Constitution. To date, there is no indication of any desire on the part of Plaintiffs to invoke the amendment process.

The subject of judicial merit selection is not new to the federal courts. Voters in at least two other states have brought challenges to merit selection systems that similarly rely on attorney input in the nomination of candidates to the Governor. *See Bradley v. Work*, 916 F. Supp. 1446 (S.D. Ind. 1996), *aff'd*, 154 F.3d 704 (7th Cir. 1998); *African-American Voting Rights Legal Defense Fund, Inc. v. Missouri*, 994 F. Supp. 1105 (E.D. Mo. 1997) ("*AAVRLDF*"), *aff'd*, 133 F.3d 921 (8th Cir. 1998) (per curiam) (unpublished). In *Bradley*, minority voters challenged the merit selection system for county judges in Indiana, which, like this case, involved a nominating commission composed in part of attorney members selected by the licensed attorneys of the county. 916 F. Supp. at 1450. The district court upheld the system as consistent with the Equal Protection Clause, *id.* at 1455-59, and the voters did not pursue the issue on appeal. *Bradley,* 154 F.3d at 706, 711. Similarly, in *AAVRLDF*, African-American voters in Missouri alleged they were denied equal protection of the laws because they were at the time underrepresented in the Missouri Bar Association, which selected attorney members of a nominating commission. *AAVRLDF*, 994 F. Supp. at 1126-27. The district court upheld the constitutionality of Missouri's merit selection system because its purpose was not invidious discrimination. *Id*. at 1126-29. The Eighth Circuit affirmed in an unpublished opinion. *AAVRLDF*, 133 F.3d at 921.

Because the federal litigation has not resulted in any precedential opinion in any circuit, this case has gained the attention of individuals and groups with an interest in either protecting or replacing merit selection. This litigation, therefore, must be seen as part of a larger controversy generated by attacks on merit selection by proponents of popularly elected judges. *See, e.g.*, Michael DeBow et al., *The Case for Partisan Judicial Elections*, 33 U. Tol. L. Rev. 393 (2002) (attacking merit selection); Brian T. Fitzpatrick, *The Politics of Merit Selection*, 74 Mo. L. Rev. 675 (2009) (evaluating politicization of merit selection process); Sandra Day O'Connor, *The Essentials and Expendables of the Missouri Plan*, 74 Mo.

L. Rev. 479 (2009) (defending merit selection). We therefore take this opportunity to publish an opinion dealing with the issues Plaintiffs raise as best we are able to perceive them. We turn first, however, to the background of merit selection in Alaska and of this litigation.

## ALASKA'S MERIT SELECTION SYSTEM

Alaska's Constitution and statutes establish a merit selection system for appointing state judges. The system was adopted, after extensive debate, at the Constitutional Convention in 1955, when Alaska was still a territory. *See generally* Alaska Constitutional Convention Minutes ("ACCM"), Days 32 and 35 (Dec. 9 and 12, 1955), *available at* http://www.law.state.ak.us/doclibrary/cc_minutes.html. The Alaska Constitution was ratified by Alaska's voters and approved by Congress, which found it to be "republican in form and in conformity with the Constitution of the United States and the principles of the Declaration of Independence." Alaska Statehood Act, Pub. L. No. 85-508, § 1, 72 Stat. 339, 339 (1958).

The system in the Alaska Constitution is based on the "Missouri Plan," developed in Missouri in the 1940s and later adopted in whole or in part by 33 states and Washington, D.C. Although there is no uniform approach to merit-based selection, there are characteristics common to the systems utilized by Alaska and other states. These characteristics include, among others: vesting responsibility for screening applicants and recommending candidates in an independent, non-partisan or bi-partisan nominating commission; specifying that the nominating commission be composed of both lay people and lawyers; and requiring the Governor to make an appointment from a list of nominees submitted by the commission.

The Alaska Constitution prescribes judicial selection for the constitutionally created courts: the Alaska Supreme Court and the Alaska Superior Court, which is the trial court of gen-

eral jurisdiction for the State. Alaska Const. art. IV, §§ 1-8. The Alaska legislature, by statute, adopted the same selection procedures for the judges of Alaska's other state courts. Alaska Stat. §§ 22.07.070, 22.15.170(a), (e).

The system requires the Governor to appoint each judge from a list of applicants nominated as most qualified by an independent constitutional body, the Alaska Judicial Council ("Judicial Council" or "Council"). Alaska Const. art. IV, § 5. The Council consists of the Alaska Supreme Court Chief Justice, three citizens appointed by the Governor and confirmed by the Legislature, and three attorneys appointed by the Board of Governors of the Alaska Bar Association. Alaska Const. art. IV, § 8. The Constitution describes the organization of the Judicial Council as follows:

> The judicial council shall consist of seven members. Three attorney members shall be appointed for six-year terms by the governing body of the organized state bar. Three non-attorney members shall be appointed for six-year terms by the governor subject to confirmation by a majority of the members of the legislature in joint session. Vacancies shall be filled for the unexpired term in like manner. Appointments shall be made with due consideration to area representation and without regard to political affiliation. The chief justice of the supreme court shall be ex-officio the seventh member and chairman of the judicial council. No member of the judicial council, except the chief justice, may hold any other office or position of profit under the United States or the State. The judicial council shall act by concurrence of four or more members and according to rules which it adopts.

*Id.*

The Alaska Bar Association's Board of Governors is the "governing body of the organized state bar" and is responsible

for appointing three of the seven members of the Judicial Council. *See* Alaska Stat. § 08.08.030 ("The Alaska Bar is governed by the Board of Governors of the Alaska Bar."); Alaska Const. art. IV, § 8 (delegating to Board of Governors the power to appoint three members of the Judicial Council). The Board of Governors consists of three non-attorney citizens appointed by the Governor and confirmed by the Legislature, and nine attorneys elected by the active members of the Bar Association. Alaska Stat. §§ 08.08.040(b); 08.08.050(a). In order to practice law in Alaska, an attorney must be a member of the Bar. *Id.* § 08.08.020(a). Only active Bar members are eligible to vote for the nine attorney members of the Board of Governors. Alaska Stat. § 08.08.040; Alaska Bar Bylaws art. IV, § 2. Active members of the Bar have passed a bar examination, paid their dues, and met the Bar Association's standard of character and fitness. Alaska Bar Rules 2, 5.

Alaska's statehood founders explicitly debated this structure at the State's Constitutional Convention. *See* ACCM, Days 32 and 35 (Dec. 9 and 12, 1955). At the convention, the chair of the Committee on the Judiciary Branch, George McLaughlin, explained to the convention delegates that judicial independence suffers when judges are elected, and that an appointive system would prevent the state judiciary from being "controlled by a political machine." ACCM, Day 32 (Dec. 9, 1955). McLaughlin also explained the importance of having attorney members on the Judicial Council, because they are knowledgeable about the strengths and weaknesses of fellow attorneys with whom they work:

> The whole theory of the Missouri Plan is that in substance, a select and professional group, licensed by the state, can best determine the qualifications of their brothers. The intent of the Missouri Plan was in substance to give a predominance of the vote to professional men who knew the foibles, the defects and the qualifications of their brothers. It is unquestion-

> ably true that in every trade and every profession the
> men who know their brother careerists the best are
> the men engaged in the same type of occupation.
> That was the theory of the Missouri Plan. The theory
> was that the bar association would attempt to select
> the best men possible for the bench because they had
> to work under them.

ACCM, Day 35 (Dec. 12, 1955). McLaughlin also explained the importance of having the Bar Association, rather than the Governor, appoint the attorney representatives, because they represent no outside interests:

> The three who are appointed by the bar . . . are there,
> based solely on their professional qualifications but
> selected because they would represent in theory the
> best thinking of the bar, and they are there solely
> because they represent their craft.

*Id.* He described the involvement of the state bar association in the selection of the attorney members as "the very essence" of the Missouri Plan. *Id.*

Another delegate proposed an amendment that would have required legislative confirmation of the attorney members of the Council. *Id.* Delegate McLaughlin spoke against the proposal, arguing that the members should not have to be acceptable politically:

> [I]f this motion is passed you might as well tear up
> the whole proposal and provide for the election of
> juries, because then it would be more efficacious and
> more democratic. . . . If you require a confirmation
> of your attorney members you can promptly see
> what will happen. The selection is not then made by
> the organized bar on the basis of a man's profes-
> sional qualifications alone. The determination of the
> selection of those people who are on the judicial

council will be qualified by the condition, are they acceptable to a house and a senate or a senate alone, which is essentially Democratic or essentially Republican. . . . If political correctness enters into the determination of those professional members who are to be placed upon the judicial council, the whole system goes out the window.

*Id.* Delegate Ralph Rivers concurred:

I want to heartily second the remarks of Mr. McLaughlin but also want to point out that the purpose of the draft as now written is to have a nonpartisan selection of these lawyer members, and the minute you adopt something like this, you are making a partisanship proposition out of it. We want to carry through to a nonpartisan selection of judges . . . .

*Id.* The proposal to require legislative confirmation of the lawyers appointed to the Judicial Council failed by a vote of 49 nays to four yeas, with two absent. *Id.*

Alaska has followed the judicial selection system adopted at the Constitutional Convention for over 50 years. Every judge who has been appointed since statehood has been appointed by the Governor from the list of people nominated by the Judicial Council.

In practice, the judicial selection process begins when the Judicial Council receives notice that a vacancy exists or is about to occur. The Council then begins seeking applicants for the open position by issuing notification of the vacancy to the public and the Alaska Bar Association. The Council's screening process involves an application form and a comprehensive investigation into the applicant's education, employment, credit, and criminal records. The Judicial Council solicits information from references, and interviews all appli-

cants. The public is invited to comment on applicants by letter or email, and the Council holds a public hearing to receive testimony.

After reviewing the information gathered, the Council meets to vote for the candidates who will be sent to the Governor as nominees. Any action of the Council to recommend a candidate requires the concurrence of four or more members, Alaska Const. art. IV, § 5, and the Council must recommend at least two candidates for any vacant position, *id.* art. IV, § 8. The Governor must appoint one of the Council's nominees within 45 days of receiving the nominations. Alaska Stat. § 22.05.080(a). The Governor is bound by the nominees presented to him; the Governor may neither select a person other than those nominated, nor ask the Council for additional nominations. *See* Alaska Const. art. IV, § 5.

Once a judge is nominated by the Judicial Council and appointed by the Governor, the judge is subject to a non-partisan retention election at the first general election held more than three years after appointment. *Id.* art. IV, § 5.

## PROCEDURAL BACKGROUND

This is a suit by individual voters against the members of the Judicial Council. Plaintiffs, Kenneth Kirk, Carl Anders Ekstrom, and Michael Miller (collectively "Plaintiffs"), are all registered voters in the State of Alaska. Kirk is also an active member of the Alaska Bar Association and a former and potential future applicant for vacant positions on the Alaska Supreme Court and the Alaska Superior Court. Ekstrom is a non-attorney member of the Board of Governors.

Defendants are the seven members of the Alaska Judicial Council in their official capacities. They include Chief Justice Walter Carpeneti of the Alaska Supreme Court, as well as the three attorney members and the three non-attorney members of the Council.

Plaintiffs' suit arose in 2009 in connection with an imminent vacancy on the Alaska Supreme Court created when Justice Robert L. Eastaugh announced his anticipated retirement. On April 15, 2009, the Council invited members of the Bar to apply for the position to be filled pursuant to Alaska's merit selection procedures. In July 2009, Plaintiffs filed a complaint and motion for preliminary injunction in the United States District Court for the District of Alaska alleging that their constitutional right to equal protection under the Fourteenth Amendment of the United States Constitution was violated by Alaska's merit selection system, as prescribed in Alaska Constitution art. IV, sections 5 and 8, and as implemented by Alaska Statutes sections 22.05.080, 22.07.070, 22.10.100, and 22.15.170.

Plaintiffs sought to enjoin the three attorney members of the Council from exercising their powers to deliberate and vote on nominees to fill the vacancy created by Justice Eastaugh's retirement. As a corollary matter, in order to allow the remaining lay members of the Judicial Council to act, Plaintiffs sought to enjoin the requirement that four votes were needed for the Council to propose a nomination.

Defendants moved to dismiss, arguing that the judicial selection system did not violate equal protection. After a hearing, the district court granted Defendants' motion to dismiss and denied Plaintiffs' consolidated motion for a preliminary injunction. The district court identified the three stages of decision-making involved in Alaska's merit selection system and concluded that none violates the Equal Protection Clause. The district court first looked at the overall appointment of judicial nominees, and held that the general "one person, one vote" rule first established in legislative redistricting cases does not apply to judicial elections and appointments. The district court then examined the two steps preceding the judicial appointment itself: the election of the Board of Governors by the Alaska Bar Association, and the Board of Governors' appointment of attorney members to the Judicial Council. The

district court held that the election of the Board of Governors by the membership of the Alaska Bar Association did not violate the Equal Protection Clause because the election fell within an exception from general election requirements that is recognized for limited purpose entities. It also held that the Board of Governors' selection of the attorney members of the Judicial Council presented no constitutional issue under election law principles because the members of the Judicial Council are appointed, rather than elected. Finding no constitutional barrier to Alaska's system, the district court dismissed Plaintiffs' suit. Plaintiffs then timely appealed to this court.

## DISCUSSION

**[1]** Virtually all litigation challenging the selection process for state public officials has concerned the political branches of government, *i.e.*, the legislative and executive branches. *See* Pamela S. Karlan, *Electing Judges, Judging Elections, and the Lessons of* Caperton, 123 Harv. L. Rev. 80, 82-83 (2009) (discussing limited extension of election law principles to the judicial branch). The challenges have focused principally on the election process, rather than appointments. This case involves neither the political branches, nor the direct election of the members of any branch of government. The federal courts have recognized no constitutional principle that supports Plaintiffs' contention that all participants in the judicial selection process must be either popularly elected or appointed by a popularly elected official, and have rejected all such assertions. Plaintiffs therefore cannot obtain the changes they seek through the courts. Our conclusion is demonstrated by the election cases upon which Plaintiffs rely.

**[2]** Plaintiffs cite the body of cases in which the Supreme Court has applied the Equal Protection Clause of the Fourteenth Amendment to the selection of state and local public officials. *See, e.g.*, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969); *Reynolds v. Sims*, 377 U.S. 533 (1964).

The Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has repeatedly recognized that the Fourteenth Amendment does not protect a generalized "right to vote," but rather protects a citizen's right to participate in elections on equal footing with other citizens in the jurisdiction. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9-10 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n.78 (1973). The Court has interpreted the Equal Protection Clause to protect an individual's right to equal voting participation in at least two ways: through rejecting overly restrictive voter qualifications ("vote denial"), and through rejecting disproportionate voting districts ("vote dilution"). *See Kramer*, 395 U.S. at 626-27 (recognizing the Court's protections against vote denial and vote dilution).

In the vote denial cases, the Supreme Court has held that the Equal Protection Clause prohibits states from imposing voter qualifications that result in the wholesale exclusion of a particular constituency from an election, unless the state can demonstrate that the classification serves a compelling state interest. *See, e.g.*, *Hill v. Stone*, 421 U.S. 289, 297 (1975) (holding unconstitutional Texas laws denying franchise in city bond elections to those not paying property tax); *Kramer*, 395 U.S. at 622 (holding unconstitutional a New York statute limiting franchise in school board elections to owners or lessees of real property and parents of school children); *Harper v. Va State Bd. of Elections*, 383 U.S. 663 (1966) (holding Virginia poll tax unconstitutional); *Carrington v. Rash*, 380 U.S. 89 (1965) (holding unconstitutional Texas law denying vote to members of armed forces who move to state in course of military duty). States may thus restrict the franchise on the grounds of residence, age, and citizenship, but other classifications are suspect and subject to strict scrutiny. *Hill*, 421 U.S. at 297.

While recognizing that states generally cannot deny citizens the right to vote on the basis of suspect classifications,

the Supreme Court has also recognized that states and localities can restrict voting in certain elections involving so-called "limited purpose entities" are involved. *See Ball v. James*, 451 U.S. 355, 371 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 728 (1973). Limited purpose entities characteristically serve only a "special limited purpose" and have no power to impose taxes or enact laws. *Salyer*, 410 U.S. at 728. They do not administer "such normal functions of government" as maintenance of streets, operation of schools, or provision of sanitation, health, or welfare services. *Ball*, 451 U.S. at 366. States and localities may therefore, without violating the Equal Protection Clause, limit the election of the governing board of such an entity to the group of people disproportionally affected by the entity's decisions.

With respect to voter apportionment, the Supreme Court has held that the Equal Protection Clause requires state and local entities to divide electoral districts on the basis of population, so that each person's vote is equally effective. *See Reynolds*, 377 U.S. at 568-69 (apportionment of seats in Alabama Legislature unconstitutional because not based on population); *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 55-56 (1970) (extending apportionment rule to all state and local elections of legislative and administrative officials); *Bd. of Estimate v. Morris*, 489 U.S. 688, 692-93 (1989) (tracing the development of the "reapportionment doctrine"). These cases all recognize that the collective dilution of many individuals' votes can result in a form of unconstitutional disenfranchisement, even when no one individual is turned away at the ballot box. This principle is best recognized by the catch-phrase "one person, one vote." *Reynolds*, 377 U.S. at 558 (internal quotation marks omitted).

In this case, Plaintiffs are not claiming that their votes count less because of any disproportionate allocation of electoral districts. Indeed, Plaintiffs expressly disclaim reliance on such a theory. Plaintiffs' concession is compelled, because the Supreme Court has held that the Equal Protection Clause does

not require states to distribute judicial election districts according to population. *See Wells v. Edwards*, 409 U.S. 1095 (1973), *summarily aff'g*, 347 F. Supp. 453 (M.D. La. 1972); *Chisom v. Roemer*, 501 U.S. 380, 389-90 (1991) (acknowledging *Wells*'s constitutional holding in a judicial election case resolved on statutory grounds).

Nor do Plaintiffs argue they are being excluded from an election for a state official in which they are entitled to vote. The only election involved in Alaska's merit selection system is the election of the Alaska Bar Association's Board of Governors. Plaintiffs concede that the Alaska Bar Association is a limited purpose entity, and therefore the election of the Board of Governors may legitimately be restricted to the bar membership. *See Ball*, 451 U.S. at 370-71; *Salyer*, 410 U.S. at 728-30. Plaintiffs do not seek to open up the election of the Board of Governors to the general public. This concession is also sound, as the Alaska Bar Association is, indeed, a limited purpose entity. As Plaintiffs recognize, the function of the Alaska Bar Association is to regulate the legal profession in Alaska, and so its actions disproportionately affect its members. The Alaska Bar Association does not exercise any of the "normal functions of government" identified in *Salyer* and *Ball*.

**[3]** Plaintiffs argued in the district court that the vote denial cases served to invalidate the selection of the members of the Judicial Council. As the district court correctly concluded, however, the right to equal voting participation has no application to the Judicial Council because the members of the Council are appointed, rather than elected. *See Rodriguez*, 457 U.S. at 9-10; *Sailors v. Bd. of Educ.*, 387 U.S. 105, 111 (1967).

On appeal, Plaintiffs are therefore left only with their novel argument that all participants in Alaska's judicial selection process must either be elected themselves, or be appointed by a popularly elected official. This is not a traditional equal pro-

tection argument, as it does not depend on any allegation that the State has classified or categorized its citizens in an impermissible way. Plaintiffs' authority for this proposition is a footnote in *Kramer*, an election case from 1969, in which the Supreme Court briefly mentioned the concept of voters' "indirect" influence over appointments. *See* 395 U.S. at 627 n.7. Although Plaintiffs' legal support for the principle they ask us to adopt is thin, we nevertheless address it with comprehensive care.

In *Kramer*, the plaintiff sought the right to vote in a school board election. Kramer, a 31-year old bachelor who lived with his parents, challenged a New York statute limiting voting in certain school board elections to property owners, leaseholders, and parents with children enrolled in the public schools. *Id.* at 622-23. The Supreme Court applied strict scrutiny and held that the voting restrictions violated the Equal Protection Clause because they impermissibly denied citizens who have a legitimate interest in school affairs the opportunity to participate in elections. *Id.* at 630-32. The statute excluded large groups of potentially interested voters—including senior citizens, clergy, those living on tax-exempt property, boarders and lodgers, and parents with children too young to attend school or with children enrolled in private schools—and thus was not narrowly tailored to achieve the State's professed interest in restricting the franchise to those "primarily interested in school affairs." *Id.*

*Kramer* contained a brief discussion, in a footnote, of the relationship between elections and appointments. It contrasted the New York statute at issue, which provided for election of the school board by a subset of the general public, with a typical appointive system. *Id.* at 627 n.7. The Court explained that a voter has "indirect" influence over an appointment by virtue of voting for the appointing official. Because of the potential for indirect influence in appointments, the Court concluded that selective disenfranchisement of certain voters can result in more exclusion than the entire elimination of an election.

The Court explained its reasoning with a hypothetical that contains one sentence Plaintiffs now claim to be dispositive here:

> Of course, the effectiveness of any citizen's voice in governmental affairs can be determined only in relationship to the power of other citizens' votes. For example, if school board members are appointed by the mayor, the district residents may effect a change in the board's membership or policies through their votes for the mayor. Cf. N.Y.Educ.Law § 2553, subds. 2, 4 (1953), as amended (Supp. 1969). *Each resident's formal influence is perhaps indirect, but it is equal to that of other residents.* However, when the school board positions are filled by election and some otherwise qualified city electors are precluded from voting, the excluded residents, when compared to the franchised residents, no longer have an effective voice in school affairs.

*Id.* (emphasis added).

This passage was part of the Court's explanation of the importance of equal participation in state and local elections. *Kramer* went on to discuss the relationship between elections and appointments in its discussion of the applicable standard of review. *See id.* at 628-29. The Court cautioned that the need for strict scrutiny of the election process was "undiminished" by the fact that the public office at issue could, without constitutional problem, have been filled by appointment rather than election. *Id.* at 628. The Court concluded that states have flexibility to determine whether an official should be elected or appointed, but that once a state chooses to hold an election, the election must comport with the requirements of the Equal Protection Clause. *Id.* at 629. Thus, a city charter could legitimately provide for appointment of the mayor by a city council elected by the general population. *Id.* at 629. In contrast, however, a city charter providing for a mayoral election in which

only some resident citizens could vote would call for strict scrutiny. *Id.* at 629-30.

**[4]** Plaintiffs' attempt to characterize *Kramer*, and particularly the footnote 7 sentence referring to equal indirect influence in appointments, as holding that the Equal Protection Clause requires limiting the appointment power to officials who have been popularly elected. They thus contend that *Kramer* renders the power of Bar-selected Council members unconstitutional. The *Kramer* footnote does not stand for any such proposition. *Kramer* illustrated how voters could indirectly influence school board appointments as part of its explanation of why New York's exclusion of certain voters in school board elections was unconstitutional. The Court did not suggest a sweeping new constitutional rule that appointments for all positions in every branch of government must be made by an official who is popularly elected.

**[5]** In fact, the Supreme Court has already rejected Plaintiffs' far-reaching proposition. In *Rodriguez*, the Supreme Court considered whether Puerto Rico could delegate to a political party the power to appoint someone to fill an interim vacancy in the Puerto Rico Legislature. 457 U.S. at 3. Members of the opposing party argued that the appointment mechanism was constitutionally defective because the power to appoint had to be vested in an elected official. *Id.* at 12. The Supreme Court disagreed, finding no such constitutional requirement. *Id.* The Court therefore upheld a regime in which appointments on a temporary basis were made by a body not elected by the "people as a whole."

**[6]** Moreover, even assuming there is some validity to the general proposition Plaintiffs advance, there is no meaningful violation of it here. In this case, the power vested in the Judicial Council is not to make the final appointment, but to nominate persons for judicial selection. The ultimate power to appoint judges is in the Governor, who is popularly elected by the people of Alaska. In addition, the people have the oppor-

tunity to reject the appointment in subsequent retention elections.

Alaska is not the only state to give a significant role to attorneys in the merit selection process. Fourteen other states, including Alabama, Hawaii, Indiana, Iowa, Kansas, Kentucky, Missouri, Nebraska, Nevada, New Mexico, Oklahoma, South Dakota, Vermont, and Wyoming, have systems in which (1) the nominating commission includes attorney members who are chosen neither through popular election nor by a popularly elected government official; and (2) the governor of the state must select a candidate nominated by the commission.

There are also well-established federal judicial appointments that do not conform to Plaintiffs' desired universal principle. For example, federal magistrate judges are nominated by merit selection panels composed of lawyers and community members, and then appointed by a majority of district court judges in the district where the magistrate is to serve. *See* 28 U.S.C. § 631(a), (b)(5). Similarly, federal bankruptcy judges are nominated by merit screening committees and then appointed by federal appellate judges. *See id.* § 152(a)(1). In both cases, neither the judges nor the members of the nominating body are popularly elected.

Ultimately, Plaintiffs seek to effectuate a change in Alaska's constitutional policy through the courts because Plaintiffs would prefer judges to be elected and want to reduce attorney influence. The pros and cons of merit selection as a system for selecting state court judges, and the pros and cons of giving attorneys a particular role in that system, were discussed at the Alaska Constitutional Convention. Debate continues to the present day. *See* Jeffrey D. Jackson, *Beyond Quality: First Principles in Judicial Selection and Their Application to a Commission-Based Selection System*, 34 Fordham Urb. L.J. 125 (2007) (characterizing debate). In the United States, the discussion of merit selection and attorney influence is ongo-

ing and increasingly informed by empirical data. Some states have acted through the legislature or referendum to reduce attorney influence. *See, e.g.*, O'Connor, 74 Mo. L. Rev. at 492 (describing Arizona's "move from attorney-dominated selection commissions to commissions dominated by lay members of the public").

**[7]** Alaska's founders, when considering the selection of the members of the Judicial Council at the Constitutional Convention, discussed these tensions and resolved the debate in favor of the expertise that attorneys could bring to the process. The Equal Protection Clause, as long interpreted by the federal courts, does not preclude Alaska from making that choice.

**AFFIRMED.**